# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Plaza Mariachi, LLC, | Case No. 3:24-bk-02441 |
| Debtor. | Judge Hon. Charles M. Walker |

> **THE DEADLINE FOR FILING A TIMELY RESPONSE IS: NOVEMBER 26, 2025. IF A RESPONSE IS TIMELY FILED, THE HEARING WILL BE: DECEMBER 3, 2025 AT 11:00 A.M., COURTROOM 2, 701 BROADWAY, NASHVILLE, TENNESSEE 37203 (VIRTUAL HEARING IF ALLOWED; SEE COURT'S WEBSITE FOR DETAILS)**

## NOTICE AND MOTION TO APPROVE: (I) SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; (II) APPROVAL OF PAYMENT OF COMMISSION TO REAL ESTATE BROKER; AND (III) RELATED RELIEF

Plaza Mariachi, LLC (the "Debtor"), debtor and debtor-in-possession, has filed a *Motion To Approve: (I) Sale Of Real Property Free And Clear Of Liens, Claims And Interests; (II) Payment of Commission to Real Estate Broker; And (III) Related Relief*, pursuant to 11 U.S.C. §§ 105(a), 330, 363(b), 363(f) and 363(m), Bankruptcy Rules 2002, 2016 and 6004, and Local Rules 2016-1 and 6005-1, asking the Court to enter an order, in the form attached hereto as Exhibit "A", approving the Debtor's sale of its real property commonly known as Plaza Mariachi and The Shops at Plaza Mariachi (as more particularly described in the Purchase Agreement (defined below), the "Property") pursuant to the terms and conditions stated in the *Agreement of Purchase and Sale*, dated September 8, 2025 (as amended by that certain *First Amendment to Agreement of Purchase and Sale*, dated as of October 16, 2025, the *Second Amendment to Agreement of Purchase and Sale*, dated as of October 31, 2025, and the *Third Amendment to Agreement of Purchase and Sale*, dated November 4, 2025, the "Purchase Agreement"), executed by the Debtor and HC Plaza, LLC, a Tennessee limited liability company ("Buyer"), free and clear of all liens, claims and interests, with all such liens, claims and interests to attach to the sale proceeds to the same extent, validity and priority as they encumbered the Property. The Debtor also requests final Court approval and payment of the broker's commission and certain undisputed liens from escrow at closing, and waiver of the 14-day stay of the sale approval order under Bankruptcy Rule 6004(h).

1

**YOUR RIGHTS MAY BE AFFECTED**.  If you do not want the Court to grant the attached motion, or if you want the Court to consider your views on the motion, then on or before November 26, 2025 you or your attorney must:

1.      File with the Court your response or objection explaining your position. Please note: the Bankruptcy Court for the Middle District of Tennessee requires electronic filing.  Any response or objection you wish to file must be submitted electronically.  To file electronically, you or your attorney must go to the court website and follow the instructions at**: <https://ecf.tnmb.uscourts.gov>.**

If you need assistance with Electronic Filing you may call the Bankruptcy Court at (615) 736-5584.  You may also visit the Bankruptcy Court in person at:  701 Broadway, 1st Floor, Nashville, TN (Monday - Friday, 8:00 a.m. - 4:00 p.m.).

2.      Your response must state the deadline for filing responses, the date of the scheduled hearing and the motion to which you are responding.

3.      You must serve your response or objection by electronic service through the Electronic Filing system described above.  You must also mail a copy of your response to:

> Sean C. Wlodarczyk (TN SBN 30410)
> EVANS, JONES & REYNOLDS, PC
> 401 Commerce Street, Suite 710
> Nashville, TN 37219
> Email: Swlodarczyk@ejrlaw.com
>
> Todd A. Burgess (AZ SBN 019013) (Admitted *Pro Hace Vice*)
> Janel M. Glynn (AZ SBN 025497) (Admitted *Pro Hace Vice*)
> THE BURGESS LAW GROUP
> 3131 E. Camelback Road, Suite 224
> Phoenix, AZ 85016
> Email:  todd@theburgesslawgroup.com
> Email:  janel@theburgesslawgroup.com
>
> United States Trustee's Office
> 701 Broadway, Suite 318
> Nashville, TN 37203
> ustpretion08.na.ecf@usdoj.gov

If a response is filed before the deadline stated above, the hearing will be held at the time and place indicated above. **THERE WILL BE NO FURTHER NOTICE OF THE HEARING DATE.** You may check whether a timely response has been filed by viewing

the case on the Court's website at <https://ecf.tnmb.uscourts.gov>. You may also view the guidelines for when Virtual Participation is allowed on the court's website.

If you or your attorney does not take these steps, the Court may decide that you do not oppose the relief sought in the motion and may enter the attached order granting that relief.

Dated this 5th day of November 2025.

Respectfully Submitted,

By: ___/s/Todd A. Burgess, Esq._____
Todd A. Burgess (AZ SBN 019013)
(Admitted *pro hac vice*)
Janel M. Glynn (AZ SBN 025497)
(Admitted *pro hac vice*)
THE BURGESS LAW GROUP
3131 E. Camelback Road, Suite 224
Phoenix, AZ 85016
Tel. 602-806-2100
Email: todd@theburgesslawgroup.com
Email: janel@theburgesslawgroup.com
*Bankruptcy Counsel for the Debtor*

Sean C. Wlodarczyk (TN SBN 30410)
EVANS, JONES & REYNOLDS, PC
401 Commerce Street, Suite 710
Nashville, TN 37219
P: (615) 259-4685
F: (615) 256-4448
Email: Swlodarczyk@ejrlaw.com
*Local Counsel for Debtor*

3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Plaza Mariachi, LLC, | Case No. 3:24-bk-02441 |
| | Judge Hon. Charles M. Walker |
| Debtor. | **MOTION TO APPROVE: (I) SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; (II) APPROVAL OF PAYMENT OF COMMISSION TO REAL ESTATE BROKER; AND (III) RELATED RELIEF** |

Plaza Mariachi, LLC (the "Debtor"), pursuant to 11 U.S.C. §§ 105(a), 330, 363(b), 363(f) and 363(m), Bankruptcy Rules 2002, 2016 and 6004, and Local Rules 2016-1 and 6005-1, respectfully requests that the Court enter an order, in the form attached hereto as Exhibit "A", approving the Debtor's sale of its real property commonly known as Plaza Mariachi and The Shops at Plaza Mariachi (as more particularly described in the Purchase Agreement (defined below), the "Property") pursuant to the terms and conditions stated in the *Agreement of Purchase and Sale*, dated September 8, 2025 (as amended by that certain *First Amendment to Agreement of Purchase and Sale*, dated as of October 16, 2025, the *Second Amendment to Agreement of Purchase and Sale*, dated as of October 31, 2025, and the *Third Amendment to Agreement of Purchase and Sale*, dated November 4, 2025, the

"Purchase Agreement"),[1] executed by the Debtor and HC Plaza, LLC, a Tennessee limited liability company ("Buyer"), free and clear of all liens, claims and interests, with all such liens, claims and interests to attach to the sale proceeds to the same extent, validity and priority as they encumbered the Property. The Debtor also requests final Court approval and payment of the broker's commission and certain undisputed liens from escrow at closing, and waiver of the 14-day stay of the sale approval order under Bankruptcy Rule 6004(h).

This motion is supported by the accompanying Memorandum of Points and Authorities, all matters of record cited therein, and the attached exhibits, including the *Declaration of Jim Morris of Colliers International* (the "Morris Declaration"), attached hereto as Exhibit F, and the *Declaration of Wyatt Woeltje in Support of Debtor's Motion for Order Approving Sale of Real Property Free and Clear of Liens, Claims, and Interests* (the "Buyer's Declaration"), attached hereto as Exhibit G.

---

[1] A true and correct copy of the Purchase Agreement, as amended, is attached hereto as Exhibit B, and is incorporated herein by this reference.

<h1 style="text-align:center">MEMORANDUM OF POINTS AND AUTHORITIES</h1>

## I.    INTRODUCTION.

The Debtor has worked diligently in this case under difficult circumstances to accomplish a sale of the Property that will generate sufficient proceeds to pay all creditor and administrative claims in full. As evidenced by the Morris Declaration and the record in this case, the Debtor has marketed the Property exhaustively to potential buyers locally, regionally and nationally. A number of potential sales have fallen out for various reasons over the past sixteen (16) months. The Debtor now has a well-capitalized Buyer that is ready, willing and able to close as soon as possible. As a result, the Debtor and the Broker agree that the proposed sale represents the highest and best offer for the Property, will generate sufficient proceeds to pay all claims and full, and is in the best interests of the Debtor's estate and creditors. The Broker also strongly believes that time is of the essence. Under the unique circumstances facing the Debtor, obtaining approval of and closing the proposed sale as soon as possible presents the only realistic opportunity to pay creditors in full and resolve the case.

## II.    SUMMARY OF PROPOSED SALE.[2]

| | |
|---|---|
| Seller: | Plaza Mariachi, LLC, debtor in possession |
| Buyer: | HC Plaza, LLC, a Tennessee limited liability company |
| Subject Property: | The Land, Improvements, and Personal Property located at (i) 3941 Nolensville Pike, Nashville, Davidson County, Tennessee |

---

[2] The summary of the proposed sale contained herein is not intended to modify the terms of the Purchase Agreement. In the event of any inconsistency between any summary or description of the terms of the Purchase Agreement contained herein and the actual terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

| | |
|---|---|
| | 37211, and (ii) 3955 Nolensville Road, Nashville, Davidson County, Tennessee |
| Purchase Price | $13,450,000 |
| Earnest Money: | $100,000 |
| Broker's Commission: | $200,000, which is approximately 1.49% of the Purchase Price |
| Inspection Period | Waived 11/4/2025 |
| Closing: | The purchase and sale contemplated herein shall be consummated at the closing (the "Closing") which shall occur within the later to occur of (i) twenty (20) days after the date of expiration of the Inspection Period or (ii) five (5) days after receipt of Bankruptcy Court Approval, or such earlier date as may be mutually agreed upon by Seller and Buyer. Possession of the Property shall be transferred to Buyer on the date of the Closing, subject only to the Permitted Exceptions. |
| Unfulfilled Contingencies: | (a) Entry of the Approval Order in the Bankruptcy Case.<br><br>(b) Seller not being in default under this Agreement, all Monetary Liens shall have been satisfied in accordance with this Agreement, and all of the representations and warranties made by Seller in this Agreement being true, accurate and complete.<br><br>(c) Seller shall deliver to Buyer (i) the Tenant Estoppels, and (ii) the SNDAs as required by Section 3.12 herein. |
| Projected Closing Date: | December 10, 2025, or soon as possible after obtaining Bankruptcy Court approval. |
| Proposed Payments from Escrow at Closing (the "Closing Payments"): | • Title and Escrow Fees, estimated at no more than $20,000<br>• Broker's Commission - $200,000<br>• Real Property Taxes - $574,368.95 (estimated)<br>• FFB Loan 1295 Payoff - $6,991,700.89<br>• FFB Loan 1400 Payoff - $560,203.29<br>• Mechanic's and Judgment Liens - $73,901.81 (estimated) |

7

| | • Capital One Payoff - $4,894,786.75 |
|---|---|
| Estimated Surplus from Sale: | $135,038.30, available to pay administrative, priority and unsecured claims |

## III.  FACTUAL AND PROCEDURAL HISTORY.

### A.  Case Background.

1.      On July 1, 2024, (the "Petition Date"), Debtor commenced this case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      The Debtor remains in possession of its property and is managing its affairs as a debtor-in-possession.  No Trustee, examiner, or committee of unsecured creditors has been appointed.

3.      The Debtor is a single asset real estate debtor within the meaning of 11 U.S.C. § 101(51B).

4.      The Debtor owns two separate legal parcels, one commonly referred to as Plaza Mariachi, and one commonly referred to as The Shops at Plaza Mariachi, located at 3941 Nolensville Pike, Nashville, Davidson County, Tennessee 37211, and 3955 Nolensville Road, Nashville, Davidson County, Tennessee.

5.      Plaza Mariachi, a cultural hub and significant tourist destination in the region, originally was a Kroger anchored shopping center that served the area for many years.  After newer Kroger centers were developed in the area this Kroger location was closed and eventually sold.  The redevelopment is an impressive adaptation of a well-located retail center. The interior of the Plaza Mariachi anchor space has a mixture of tenants that range from a Bank of America branch to several restaurants, clothing and

8

jewelry stores, and a barbershop. The setting is reminiscent of a Hispanic street market complete with specialty lighting and music. A radio station broadcasts from inside the space and has windows where visitors can see their favorite disk jockeys in a live setting. However, the main attraction is the entertainment space, which hosts events up to six days a week. These events are family friendly, and community focused. Plaza Mariachi is known as the destination center for the Hispanic community, introducing organizations, nonprofits, and institutions integral to the vibrant Hispanic community. The best way to get an understanding for the Property is to visit the Plaza Mariachi website: https://plazamariachi.com.

6.     The Shops at Plaza Mariachi consist of three buildings totaling approximately 100,000 square feet of retail shop space that are well leased to a mixture of both locally owned businesses and several national brands.

7.     The Debtor leases the Property to non-debtor affiliate, PM Realty Nashville, LLC ("PM Realty"), pursuant to a Master Lease Agreement, dated January 27, 2016.  The term of the lease is 40 years and does not expire until 2056.

B.     **FFB Loans.**

1.     As of the petition date, First Financial Bank, N.A. ("FFB") was owed a total of $8,203,639.37 pursuant to two (2) loans (the "FFB Loans"): (a) Loan 1295 in the original principal amount of $8,000,000, and (b) Loan 1400 in the original principal amount of $2,000,000.

2.     The FFB Loans are secured by the Property pursuant to a Deed of Trust, Assignment of Leases and Security Agreement executed by JMM II, LLC, a Tennessee

9

limited liability company and JMM III, LLC, a Tennessee limited liability company to Jonathan R. Vinson, Trustee for the benefit of Heritage Bank USA, Inc., a Kentucky State Chartered Commercial Bank, of record in Instrument No. 201510020100643; as affected by Modification Agreement in Instrument No. 201511090113725; Second Modification and Extension Agreement in Instrument No. 201601280008248; and Appointment of Substitute Trustee in Instrument No. 202405230038624, in the Register's Office of Davidson County, Tennessee.

3.     The FFB Loans also are secured by an Assignment of Leases and Rents between JMM II, LLC, a Tennessee limited liability company and JMM III, LLC, a Tennessee limited liability company, as Assignor, and Heritage Bank USA, Inc., a Kentucky State Chartered Commercial Bank, as Assignee, of record in Instrument No. 201510020100644; as affected by First Amended Assignment of Leases and Rents in Instrument No. 201511090113726; and Second Amended Assignment of Leases and Rents in Instrument No. 201601280008249, in the Register's Office of Davidson County, Tennessee.

4.     As of the Petition Date, FFB claims that it was owed $7,277,713.54 under Loan 1295, calculated as follows: the principal balance of $7,024,339.04, accrued unpaid interest in the amount of $200,938.80, and fees and costs in the amount of $52,435.70. *See* FFB Proof of Claim, 8-1 Part 2, p. 1 of 226.

5.     FFB's Proof of Claim, 8-1, Box 9, p. 2 of 3 states that the interest rate for loan 1295 at the time of filing was 12.00%. However, the Amended and Restated

Promissory Note, dated April 12, 2018 evidencing Loan 1295 states that the rate of interest is 5.25%. *See* FFB Proof of Claim, 8-1, Part 2, p. 69 of 226.

6.      As of the Petition Date, FFB claims that it was owed $925,925.83 under Loan 1400, calculated as follows: the principal balance of $907,446.75, accrued unpaid interest in the amount of $15,729.08, and fees and costs in the amount of $2,750. *See* FFB Proof of Claim, 8-1 Part 2, p. 1 of 226.

7.      FFB's Proof of Claim, 8-1, Box 9, p. 2 of 3 states that the interest rate for loan 1400 at the time of filing was 12.00%. However, the Amended and Restated Promissory Note, dated April 12, 2018 evidencing Loan 1400 states that the rate of interest is 4.75%. *See* FFB Proof of Claim, 8-1, Part 2, p. 138 of 226.

8.      Post-petition beginning on August 6, 2024, the Debtor began making monthly non-default, contract rate interest payments to FFB in the following amounts:

|  | Principal Balance | Interest Rate | Monthly Interest Only Payment |
|---|---|---|---|
| Loan 1295 | $   7,024,339.04 | 5.25% | $                    30,731.48 |
| Loan 1400 | $      907,446.75 | 4.75% | $                      3,591.98 |
|  |  |  | $                    34,323.46 |

9.      On information and belief, FFB applied the entire $34,323.46 payment each month to Loan 1295.

10.     On November 22, 2024, the Court entered the *Agreed Order Approving Use of Cash Collateral and Granting Related Relief* [Dkt. 78] (the "First Cash Collateral Order"), pursuant to which the Debtor, FFB, and Capital One, National Association ("Capital One") agreed, and the Court found and concluded that:

On or about August 6, 2024, the Debtor began making monthly non-

default/contract rate interest payments to FFB in the amount of $34,323.46 (the "Interest Payments"). As of the date of the Motion, the Debtor was current on all post-petition Interest Payments to FFB. All Interest Payments were paid using cash collateral of FFB and Capital One.

11.     Under the terms of the First Cash Collateral Order, the Debtor began making monthly adequate protection payments to FFB in the amount of $55,000 (the "FFB AP Payments"), on or about the 10th day of each calendar month, in lieu of the monthly interest payments, which were applied by FFB each month to paydown loan 1295.

12.     As reflected in Exhibit A to the First Cash Collateral Order (Monthly Budget), in addition to the FFB AP Payments, beginning in December 2024, non-Debtor guarantor PM Realty began making additional monthly payments of $35,000 per month (the "PM Realty Payments") to FFB, which were applied by FFB each month to paydown loan 1400.

13.     The FFB AP Payments and PM Realty Payments to FFB continued throughout the case pursuant to the *Second Agreed Order Approving Use of Cash Collateral and Granting Related Relief* [Dkt. 100] and the *Third Agreed Order Approving Use of Cash Collateral and Granting Related Relief* [Dkt. 148].

14.     As of the date of this motion, since the Petition Date, the Debtor's has paid at total of $762,970.38 of interest payments and FFB AP Payments to FFB on loan 1295; and PM Realty has paid a total of $385,000 of payments to FFB on loan 1400.

15.     As of the December 10, 2025 estimated sale closing date, after the November 2025 FFB AP Payment and PM Realty Payments have been made, FFB will be owed a total of $6,991,700.89 on loan 1295 and $560,203.29 on loan 1400, reflecting a total

paydown of $651,735.19, after taking into account the payment of post-petition interest on the FFB Loans at the contract rates. *See* FFB Loan Calculations, attached hereto as Exhibit C.

C.    **Capital One Debt.**

1.    As of the petition date, Capital One was owed $6,625,839.16. *See* Capital One Proof of Claim, 6-1. Under the Settlement Agreement (described below), no interest accrues on the Capital One debt.

2.    Mark Janbakhsh (the principal of the Debtor) and certain entities controlled by Mark Janbakhsh, including the Debtor (collectively, the "Settling Parties"), and Capital One are parties to that certain Settlement Agreement dated as of July 3, 2019 (the "Settlement Agreement"). The Settling Parties are listed in the Settlement Agreement. The parties entered the Settlement Agreement to, in part, resolve the Adversary Proceeding against certain of the Settling Parties that was pending in the Bankruptcy Cases of the Auto Masters Debtors. (These Bankruptcy Cases were filed in the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court") and were jointly administered under Case No. 3:17-bk-07036.) *See* Capital One Proof of Claim, 6-1 at p. 4.

3.    In the Bankruptcy Cases of the Auto Masters Debtors, the Bankruptcy Court approved the Settlement Agreement and addressed related matters in its *Order (I) Approving Settlement Agreement Among Mark Janbakhsh, Entities Owned And Controlled By Mark Janbakhsh, And Capital One, National Association, And (II) Granting Related Relief* [Admin. Dkt. 812] (the "Bankruptcy Approval Order"). A copy of the Bankruptcy

13

Approval Order is attached hereto as Exhibit A to the Capital One Proof of Claim, 6-1. A copy of the Settlement Agreement is attached as Exhibit 1 to the Bankruptcy Approval Order. *Id.*

4.     The Capital One's claim is secured by substantially all Property of the Debtor pursuant to: (a) Deed of Trust dated as of October 3, 2019 (the "Deed of Trust") executed by Grantor entities including the Debtor for the benefit of Capital One, and recorded as Instrument No. 20191021-0107414 in the Register's Office of Davidson County, Tennessee; (b) Assignment of Leases and Rents dated as of October 3, 2019 (the "Assignment of Leases") executed by Grantor entities including the Debtor for the benefit of Capital One, and recorded as Instrument No. 20191021-0107417 in the Register's Office of Davidson County, Tennessee; (c) Security Agreement dated as of October 3, 2019 (the "Security Agreement") executed by Grantors including the Debtor for the benefit of Capital One; and (d) UCC-1 Financing Statement (the "Financing Statement") for Debtors including the Debtor listing Capital One as the Secured Party, which was filed with the Tennessee Secretary of State's Office, Financing Statement Doc #: 431383939. *See* Capital One Proof of Claim, 6-1 at pp. 4-5.

5.     At the time that the First Cash Collateral Order was entered, PM Realty agreed to make monthly payments of $33,000 to Capital One. During the case, PM Realty made total payments of at least $297,000 to Capital One. In addition, during the case, Mark Janbakhsh (the principal of the Debtor) paid Capital One an additional $1,434,052.41 of proceeds from the sale of a residential property.

6.     Based on the payments by PM Realty since the Petition Date, Capital One is

14

owed a total of $4,894,786.75 under the Settlement Agreement, secured by the Debtor's property.

D.    **Real Estate Taxes and Miscellaneous Liens.**

1.    In addition to the FFB and Capital One secured claims, the Debtor's property is encumbered by statutory liens for unpaid real property taxes estimated in the following amounts as of the projected December 10, 2025 closing date:  (a) 2023-2025 Property Taxes for 3955 Nolensville Pike in the amount of approximately $357,213.62; and (b) 2023 - 2025 Property Taxes for 3941 Nolensville Pike in the amount of approximately $217,155.34.  *See* Proofs of Claim 1-2 and 2-2.

2.    The Debtor estimates that miscellaneous mechanic's liens and judgment liens estimated at approximately $73,901.81 encumber the Debtor's property.  *See* Proofs of Claim 4-1, 5-1, and 7-1; Preliminary Title Report, attached hereto as Exhibit D.

3.    The preliminary title report for the property also reflects a Notice of State Tax Lien in an unknown amount, which the Debtor believes has been paid; and a Notice of Federal Tax Lien in the amount of $4,495.75 for 941 taxes owned by PM Realty.  The Debtor disputes these claims.  *See* Preliminary Title Report, attached hereto as Exhibit D.

E.    **Administrative, Priority and Unsecured Claims.**

1.    The Debtor estimates that it will have unpaid administrative claims in the amount of approximately $171,425 as of the projected December 10, 2025 closing date.

2.    The Tennessee Department of Revenue filed Proof of Claim 3-2 in the total amount of $17,163.39 (priority amount of $12,830.71, 11 U.S.C. § 507(a)(8)) for unpaid franchise/excise taxes, penalties and interest.  *See* Proof of Claim 3-2.

15

3.     The Tennessee Department of Environment and Conservation filed unsecured Proof of Claim No. 9-1 in the amount of $68,736.50 for estimated clean-up costs related to a historical dry cleaning business that operated on the property.  The Debtor believes this claim has been resolved through the Debtor's re-enrollment in the Tennessee Department of Environment and Conservation – DCERP Fund in May 2025, a state program that caps potential future exposure for clean-up costs related to historical dry cleaner sites.

F.     **Marketing and Sales Efforts.**

1.     By Order [Dkt. 54] dated August 12, 2024 (the "Broker Approval Order"), the Court approved the Debtor's retention of Colliers International (the "Broker") as its broker in the case.   Broker agreed to a commission of 1.75%, subject to Bankruptcy Court approval.

2.     The Debtor, with the assistance of the Broker originally marketed only The Shops at Plaza Mariachi for sale.

3.     By Order [Dkt. 70] dated October 24, 2024, the Court approved the Debtor's retention of special real estate counsel to draft all necessary documentation (PSA, Easement Agreement, and other documents) necessary for a sale of some or all of the Debtor's property.

4.     On April 2, 2025, after diligently marketing The Shops at Plaza Mariachi since May 2024, the Debtor executed a Purchase and Sale Agreement for a sale of The Shops at Plaza Mariachi for $9,000,000.  However, the proposed buyer terminated the contract prior to the end of its due diligence inspection period.

5.      On July 28, 2024, the Debtor filed a proposed plan and disclosure statement. [Dkt. 135 & 136].

6.      By Order [Dkt. 137], dated August 4, 2025, the Court set a disclosure statement hearing for September 10, 2025.

7.      On or about August 14, 2025, a federal jury in the United States District Court for the Middle District of Tennessee convicted the Debtor's principal, Mark Janbakhsh, on charges of Conspiracy to Commit Bank Fraud, Bank Fraud, Making False Statements to a Bank, Bankruptcy Fraud, and Making a False Statement Under Oath.

8.      By agreed Order [Dkt. 146], dated August 20, 2025, the Debtor, Capital One and FFB agreed to vacate the September 10, 2025 hearing on the disclosure statement to allow the Debtor additional time to negotiate the terms of the plan with Capital One and FFB without any party incurring additional time and expense litigating potential objections in light of changed circumstances affecting the Debtor's case.

9.      Following Mr. Janbakhsh's conviction, the Debtor, with the assistance of the Broker, re-focused marketing efforts on a sale of the Debtor's entire property.

10.     On or about September 8, 2025, the Debtor signed the current Purchase Agreement with Highland Capital Investments, LLC, with a proposed post-sale lease of the Plaza Mariachi anchor space by the buyer to PM Realty.  The original purchase price was $14,250,000, and the Inspection Period was scheduled to expire on October 23, 2025.

11.     The Purchase Agreement was negotiated at arms' length and the Buyer has not prior connection to the Debtor, its principal Mark Janbakhsh, or affiliates of the Debtor.

12.     Pursuant to the *First Amendment to Agreement of Purchase and Sale*, dated

17

October 16, 2025, the Debtor and Highland Capital Investments, LLC agreed as follows

(the "Rent Reserve Provision"):

> Buyer and Seller agree that at Closing Buyer shall receive a credit against the Purchase Price for the amount of $800,000 in connection with the Master Lease rent reserve. Buyer and Seller agree that the Master Lease will state that Tenant will receive a credit for the total amount of $800,000 against the rent due and payable under the Master Lease beginning at the commencement of the fourteenth (14th) year of the Term of Lease and continuing until Tenant has received the full credit of $800,000 (the "Lease Credit"). Buyer agrees that the Master Lease will not require a security deposit from Tenant. Buyer and Seller agree that in the event that Seller (or a designee controlled by Seller or its affiliates) purchases the Plaza Mariachi Parcel from Buyer prior to Tenant receiving all of the Lease Credit, then the purchasing entity shall receive a credit against the purchase price up to the amount of the Lease Credit that has not been taken and in such an event Tenant shall not receive any more of the Lease Credit.

13.     Pursuant to the *Second Amendment to Agreement of Purchase and Sale*, dated October 21, 2025, the Debtor and Highland Capital Investments, LLC agreed to extend the Buyer's Inspection Period to November 6, 2025.

14.     Pursuant to the *Assignment of Purchase and Sale Agreement*, dated October 26, 2025, Highland Capital Investments, LLC assigned the Purchase Agreement to the Buyer.

15.     Pursuant to the *Third Amendment to Agreement of Purchase and Sale*, dated November 4, 2025, the Debtor and Buyer agreed to: (a) delete the Rent Reserve Provision, (b) reduce the Purchase Price from $14,250,000 to $13,450,000; and (c) the Buyer agreed to waive any right to terminate the Purchase Agreement during the Inspection Period.  True and correct copies of the Purchase Agreement, as amended,

16.     Based on the third amendment of the Purchase Agreement, the Buyer is

18

ready, willing and able to close the sale and Purchase the Property subject only to the Bankruptcy Court's approval.

17.    Attached hereto as Exhibit E is the Debtor's estimated waterfall.  The sale proceeds are sufficient to pay all creditor claims in full, including post-petition interest on the FFB Loans at the contract rates.

## IV.    JURISDICTION AND VENUE.

1.    This Court has jurisdiction over this Motion, pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.    Venue of this proceeding and this Motion is proper in this district, pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief requested in this Motion are Sections 105, 363(b), 363(f), and 363(m) of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## V.    RELIEF REQUESTED.

1.    By this Motion, the Debtor seeks entry of an order (the "Sale Order") substantially in the form attached hereto as Exhibit A, pursuant to 11 U.S.C. §§ 105(a), 330, 363(b), 363(f) and 363(m), Bankruptcy Rules 2002, 2016 and 6004, and Local Rules 2016-1 and 6005-1, approving the Purchase Agreement and the Debtor's sale of the Property to the Buyer at closing, free and clear of all liens, claims and interests, with all such liens, claims and interests to attach to the sale proceeds to the same extent, validity and priority as they encumbered the Property.  The Debtor also requests final Court

19

approval and payment of the Broker's commission in the amount of $200,000 (1.49%) and the other Closing Payments from escrow at closing. Finally, the Debtor requests waiver of the 14-day stay of the Sale Order pursuant to Bankruptcy Rule 6004(h) for good cause shown.

## VI. APPLICABLE LAW.

### A. The Sale of the Property Under The Purchase Agreement is Appropriate Pursuant to Bankruptcy Code Section 363.

23.     Section 363(b) of the Bankruptcy Code provides that a trustee or debtor-in-possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(l). To approve a use, sale, or lease, other than in the ordinary course of business, the Court must find "a sound business purpose" for the sale. *See Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389-390 (6th Cir. 1986). *See*, *also In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania. Inc.*, 788 F.2d 143 (3d Cir. 1986) (requiring a good faith purchase); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the requirements for a sale outside the ordinary course of business include a sound business purpose, adequate and reasonable notice, a fair and reasonable price, and a good faith Buyer).

24.     The Sixth Circuit applies the "business judgment" test for approving sales under § 363(b). In *In re Nicole Energy Services, Inc.*, the court identified the following factors in considering a proposed sale: "whether the terms of the proposed sale reflect the highest and best offer for the Property, whether the negotiations were conducted at arm's

20

length, and whether the sale is in the best interest of the estate and its creditors." *See In re Nicole Energy Services, Inc.*, 385 B.R. 201, 210 (Bankr. S.D. Ohio 2008) *citing Stephens Industries, supra*.

25. The Debtor has determined that the sale of the Property, in accordance with the terms of the Purchase Agreement, is in the best interests of the Debtor, its creditors and estate. As evidenced by the Morris Declaration, the Property was marketed exhaustively both before and after the Petition Date, and the Purchase Price reflects the highest and best offer for the Property. The net sale proceeds are sufficient to pay all claims in the Debtor's case in full.

B.  **The Sale of the Property Free and Clear of all Liens, Claims and Encumbrances is Appropriate under Bankruptcy Code § 363(f).**

1. The Debtor respectfully submits that it is appropriate to sell the Property free and clear of all liens, claims and interest, pursuant to Bankruptcy Code § 363(f), with all such liens, claims and interests attaching to the sale proceeds to the same, extent, validity and priority as such liens, claims and interests attached to the Property.

2. Bankruptcy Code § 363(f) authorizes a sale free and clear of liens, claims, interests and encumbrances of an entity other than the estate if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

21

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

3.     In this case, the Debtor's sale of the Property will generate sufficient net proceeds to pay all liens against the Property in full.  Therefore, Bankruptcy Code § 363(f)(3) applies.  *See In re Heine*, 141 B.R. 185, 189 (Bankr. S.D. South Dakota 1992).

4.     Additionally, all secured creditors will receive notice of the proposed sale of the Property free and clear of liens, claims and interests.  Any secured creditor that does not object to the sale is deemed to have consented within the meaning of Bankruptcy Code § 363(f)(2).  *See In re Elliott*, 94 B.R. 343, 345 (E.D. Tenn. 1988) (A creditor who receives adequate notice of a proposed sale and fails to object is deemed to have consented.); *In re Borders Group, Inc.*, 453 B.R. 477, 484 (Bankr. S.D.N.Y. 2011) (lack of objection by a lienholder who received proper notice of the sale satisfies the consent requirement of § 363(f)(2)).

**C.     Buyer is a Good Faith Buyer and is Entitled to the Full Protections of Bankruptcy Code Section 363(m).**

1.     The Debtor respectfully submits that Buyer is purchasing the Property in good faith, and as such, is entitled to the protections set forth in 11 U.S.C. § 363(m).

2.     Bankruptcy Code § 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

3.     "Though the bankruptcy code itself does not define the term "good faith

Buyer," courts have adopted the "traditional equitable definition of a 'good faith Buyer,' " defined as "one who purchases the Property for value, in good faith, and without notice of adverse claims."" *In re Made in Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005) (citations omitted). "The good-faith requirement "speaks to the integrity of [the Buyer's] conduct in the course of the sale proceedings." *Id.*

4.      As evidenced by the Buyer's Declaration, the Purchase Agreement was negotiated at arm's length and in good faith. The Buyer and its representatives had no prior connection, affiliation, or relationship of any kind with the Debtor, its principal Mark Janbakhsh, or any affiliate of the Debtor. All negotiations were conducted through separate counsel and professional advisors, and the terms were the product of independent business judgment and bargaining. Buyer negotiated the Purchase Agreement and each amendment at arm's length, relying on its own independent judgment and due diligence, and the transaction reflects the highest and best offer for the Property obtained through a fair and open process.

5.      Buyer is ready, willing, and able to close the purchase of the Property promptly upon the Court's entry of the Sale Order approving the sale free and clear of all liens, claims, and interests, in accordance with the terms of the Purchase Agreement, as amended.

6.      Buyer has acted in good faith within the meaning of 11 U.S.C. § 363(m). Buyer has not engaged in any fraud, collusion, or conduct designed to take unfair advantage of any party in interest. Buyer has not agreed to share or split any consideration with the Debtor, its insiders, or any other bidder, and no party has been promised any benefit outside

23

the terms of the Purchase Agreement. Therefore, the Debtor respectfully submits that the Buyer is entitled to the protections set forth in Bankruptcy Code § 363(m).

D.    **A Private Sale is Appropriate Under the Circumstances.**

1.    Bankruptcy Rule 6004(f) and Local Rule 6004-1 permit a trustee to conduct a private sale pursuant to section 363. Specifically, Bankruptcy Rule 6004(f) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1); *see Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of [a] sale is within the discretion of the trustee . . .").

2.    Considering Bankruptcy Rule 6004(f) and case law regarding section 363 sales, a trustee may conduct a private sale if a good business reason exists. *See, e.g., In re MF Global, Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("The business judgment of a trustee is entitled to great deference"); *In re Pritam Realty, Inc.*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a Chapter 11 debtor); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (authorizing the private sale of debtor's tire company where "[d]ebtor has shown a sufficient business justification for the sale of the Property to the [p]urchaser"); *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved. The court should exercise its discretion based upon the facts and circumstances of the proposed sale."); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer Property by private sale).

24

3.     The Debtor submits that a private sale of the Property to the Buyer is appropriate under the circumstances.  As evidenced by the Morris Declaration, the Property was marketed exhaustively both before and after the Petition Date.  The Property has unique characteristics that have made a sale particularly challenging.  And, the circumstances surrounding the recent conviction of the Debtor's principal all combine to create a dynamic necessitating a private sale.  Requiring further marketing or an auction likely will result in the loss of the sale, risking a full recovery to all creditors.

E.     **Waiver of the Fourteen-Day Stay Period is Appropriate.**

1.     The Trustee requests that the Court waive the requirements under Fed. R. Bankr. P. 6004(h), so that the sale to the Buyer may close immediately upon satisfaction of the conditions precedent in the Purchase Agreement, rather than being subject to a fourteen (14)-day waiting period.

2.     Fed. R. Bankr. P. 6004(h) provides that an Order authorizing the "use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

3.     The purpose of these stay provisions is to afford an objecting party time to seek appellate relief before an Order becomes effective. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). However, courts frequently waive or shorten the stay period where doing so is necessary to prevent value erosion and no objections remain unresolved. *See* 10 Collier on Bankruptcy ¶ 6004.11 (Richard Levin & Henry J. Sommer eds., 16th ed.) (noting that the fourteen-day stay should be eliminated "where there has been no objection to the procedure," and may be reduced where an objection is overruled

Case 3:24-bk-02441    Doc 158    Filed 11/05/25    Entered 11/05/25 17:12:07    Desc Main
Document    Page 25 of 103

and an appeal is promptly pursued).

4.      As set forth above and in the Morris Declaration, the relief requested herein is necessary and appropriate to maximize the value of the Debtor's Property for the benefit of the Debtors' creditors. Accordingly, the Debtor submits that ample cause exists to justify waiving the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that such stay applies to the relief requested herein.

## F.      **Approval and Payment of the Broker's Commission from Escrow at Closing is Appropriate.**

1.      By Order [Dkt. 54] dated August 12, 2024 (the "Broker Approval Order"), the Court approved the Debtor's retention of Colliers International (the "Broker") as its broker in the case.   Broker agreed to a commission of 1.75%, subject to Bankruptcy Court approval.

2.      Despite the 1.75% fee stated in the Broker Approval Order, Broker as agreed to cap its commission for the sale of the Property at $200,000 or approximately 1.49% of the $13,450,000 Purchase Price.

3.      Broker has worked tirelessly over the past 16+ months attempting to locate a suitable buyer for the Property.

4.      Pursuant to Local Rule 6005-1(c) real estate commissions typically are capped at 6%.  Broker's proposed commission of approximately 1.49% is well below the typical cap.

5.      The Debtor submits that the work of Broker during the case, resulting in a $13,450,000 sale that will allow all creditors to be paid in full,

6. Bankruptcy Code § 328(a) allows the Court to approve compensation terms, including commissions, "on any reasonable terms and conditions of employment, including on a contingent fee basis."

7. Bankruptcy Code § 330(a)(1) authorizes compensation for "actual, necessary services rendered" and "reimbursement for actual, necessary expenses." For real estate brokers, the most relevant factor is reasonableness in light of market standards and the benefit to the estate.

8. For large commercial transactions, commissions in the 1-3% range are reasonable and typical. The proposed commission in this case is at or below the mid-point in that range, and less than the listing agreement provides. Additionally, Broker procured a ready, willing, and able buyer at a price sufficient to pay all creditors in full, a very clear benefit to the estate.

9. The Debtor respectfully submits that the Broker's capped $200,000 commission is reasonable, appropriate, benefitted the estate, and should be approved and paid from escrow at closing.

G. **The Other Undisputed Closing Payments Should be Paid From Escrow at Closing.**

1. Under the circumstances of this case, the Debtor submits that payment of the following Closing Payments from escrow at closing is appropriate, to the extent that there is no dispute regarding the amounts owed:

- o Title and Escrow Fees, estimated at no more than $20,000
- o Broker's Commission - $200,000
- o Real Property Taxes - $574,368.95 (estimated)
- o FFB Loan 1295 Payoff - $6,991,700.89

27

- o     FFB Loan 1400 Payoff - $560,203.29
- o     Mechanic's and Judgment Liens - $73,901.81 (estimated)
- o     Capital One Payoff - $4,894,786.75

2.     Authorizing these payments to be paid directly to the creditors from escrow at closing: (i) will stop the accrual of interest on secured claims, and (ii) eliminate any perceived risk, under the circumstances of this case, of depositing the proceeds in the DIP account prior to disbursal.

3.     To the extent any of the foregoing amounts is disputed, the Court should order the undisputed amounts paid, and the remaining amounts should be held in escrow subject to further order of the Court.

## VII.    <u>CONCLUSION.</u>

WHEREFORE, based on all of the foregoing, and the entire record before the Court, the Debtor respectfully requests that the Court grant this motion and enter the Sale Order, substantially in the form attached hereto as Exhibit A:

A.     Authorizing the Debtor to consummate the sale of the Property to the Buyer pursuant to the terms of the Purchase Agreement, free and clear of all liens, claims and interests, with all such liens, claims and interests to attach to the sale proceeds to the same extent, validity and priority as such liens, claims and interests encumbered the Property, pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), and Fed. R. Bankr. P. 6004;

B.     Approving on a final basis allowance, pursuant to 11 U.S.C. §§ 105(a) and 330, the payment of a $200,000 commission to Broker from escrow at closing;

C.     Waiving the fourteen (14) day stay provided for in Bankruptcy Rule 6004(h);

D.     Authorizing the payment of the undisputed Closing Payments from escrow

28

at closing; and

E.     Granting such other and further relief as the Court deems appropriate.

Dated: November 5, 2025.

Respectfully Submitted,

Burgess Law, LLC dba The Burgess Law Group

By:    */s/Todd A. Burgess, Esq.*
        Todd A. Burgess (AZ SBN 019013)
        (Admitted *pro hace vice*)
        Janel M. Glynn (AZ SBN 025497)
        (Admitted *pro hace vice*)
        THE BURGESS LAW GROUP
        3131 E. Camelback Road, Suite 224
        Phoenix, AZ 85016
        Tel. 602-806-2100
        Email: todd@theburgesslawgroup.com
        Email: janel@theburgesslawgroup.com
        *Bankruptcy Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing ***NOTICE AND MOTION TO APPROVE: (I) SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; (II) APPROVAL OF PAYMENT OF COMMISSION TO REAL ESTATE BROKER; AND (III) RELATED RELIEF*** was filed electronically on November 5, 2025. Notice of this filing was given via First Class U.S. Mail pursuant to Local Rule 2014-1 to the United States Trustee and all creditors and interested parties on the Debtor's most up-to-date Master Mailing List.

*/s/Todd A. Burgess, Esq.*
Counsel for Debtor

<u>**EXHIBIT A**</u>

**PROPOSED SALE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Plaza Mariachi, LLC, | Case No. 3:24-bk-02441 |
| | Judge Hon. Charles M. Walker |
| Debtor. | |

**[PROPOSED] ORDER GRANTING MOTION TO APPROVE: (I) SALE OF
REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS;
(II) APPROVAL OF PAYMENT OF COMMISSION TO REAL ESTATE
BROKER; AND (III) RELATED RELIEF**

THIS MATTER CAME ON FOR CONSIDERATION on the *Motion To Approve: (I) Sale Of Real Property Free And Clear Of Liens, Claims And Interests; (II) Approval Of Payment Of Commission To Real Estate Broker; And (III) Related Relief* (the "<u>Motion</u>") filed by Plaza Mariachi, LLC (the "<u>Debtor</u>"), debtor and debtor-in-possession, pursuant to 11 U.S.C. §§ 105(a), 330, 363(b), 363(f) and 363(m), Bankruptcy Rules 2002, 2016 and 6004, and Local Rules 2016-1 and 6005-1, asking the Court to approve the Debtor's sale of its real property commonly known as Plaza Mariachi and The Shops at Plaza Mariachi (as more particularly described in the Purchase Agreement (defined below), the "<u>Property</u>") pursuant to the terms and conditions stated in the *Agreement of Purchase and*

31

*Sale*, dated September 8, 2025 (as amended by that certain *First Amendment to Agreement of Purchase and Sale*, dated as of October 16, 2025, the *Second Amendment to Agreement of Purchase and Sale*, dated as of October 31, 2025, and the *Third Amendment to Agreement of Purchase and Sale*, dated November 4, 2025, the "Purchase Agreement"), executed by the Debtor and HC Plaza, LLC, a Tennessee limited liability company ("Buyer"), free and clear of all liens, claims and interests, with all such liens, claims and interests to attach to the sale proceeds to the same extent, validity and priority as they encumbered the Property. The Debtor also requests final Court approval and payment of the broker's commission and certain undisputed liens from escrow at closing, and waiver of the 14-day stay of the sale approval order under Bankruptcy Rule 6004(h). Unless expressly stated otherwise, capitalized terms used herein shall have the meanings ascribed to such terms in the Motion and Purchase Agreement.

It appearing that due and adequate notice of the Motion having been given to all parties entitled thereto, and that no other or further notice need be given pursuant to all applicable bankruptcy rules and that no objections were filed; it appearing that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and after due deliberation, and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. The Court has jurisdiction to consider the Motion, pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a Final Order consistent with Article III of the U.S. Constitution. Venue is proper in this District and in this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

32

B.     This Order constitutes a Final Order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h), there is no just reason for delay and immediate effectiveness is warranted as set forth herein.

C.     As evidenced by the certificate of service filed with the Court: (i) proper, timely, adequate, and sufficient notice of the Motion, the Purchase Agreement, and the sale has been provided by the Debtor; (ii) such notice was good, sufficient, and appropriate under the particular circumstances, and in compliance with section, 363 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 9014; and (iii) no other or further notice of the Motion, the Purchase Agreement or the sale is required.

D.     A fair and reasonable opportunity to object to the Motion and the sale has been given to all interested Persons (as defined in section 101 of the Bankruptcy Code) and entities including, but not limited to, the following: (i) all parties who have requested notice in the bankruptcy case; (ii) all applicable federal, state, provincial, and local taxing and regulatory authorities; (iii) all known parties holding or asserting a lien or other security interest in the Debtors' Property; (vi) all of the Debtors' known creditors; and (vii) all parties listed on the Debtor's creditor matrix.

E.     The Debtor has demonstrated good, sufficient, and sound business purpose and justification and compelling circumstances for the sale pursuant to section 363(b) of the Bankruptcy Code.  Such business reasons include, without limitation, the following: (i) the Purchase Agreement constitutes the highest or otherwise best offer for the Property; (ii) the Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Property for the benefit of creditors; and (iii) any other transaction,

33

including, without limitation, pursuant to a Chapter 11 plan, would not have been feasible of yielded as favorable an economic result.

F.     The Buyer is a good faith Buyer under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

G.     The terms and conditions of the Purchase Agreement are fair and reasonable. The consideration of $13,450,000 provided by the Buyer for the Property pursuant to the Purchase Agreement (a) is fair and reasonable, (b) is the highest or best offer for the Property, (c) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (d) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.

H.     The sale of the Property outside a Chapter 11 plan pursuant to the Purchase Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a Chapter 11 plan of the Debtor. The Sale does not constitute a *sub rosa* plan.

I.     The Debtor has good marketable title to the Property and is lawful owner of the Property. The Debtor may sell the Property free and clear of all, liens, interests, obligations, rights, encumbrances, pledges, mortgages, deeds of trust, security interests, claims (including, any "claim" as defined in Section 101(5) of the Bankruptcy Code), leases, possessory leasehold interests, charges, options, rights of first refusal or option to purchase any real property, easements, servitudes, transfer restrictions under any

34

agreement, judgments, hypothecations, demands, licenses, sublicenses, assignments, debts, obligations, guaranties, options, contractual commitments, restrictions, environmental liabilities, options to purchase, and options, in each case of whatever kind, nature, or description in, against, or with respect to any of the Property, having arisen, existed or accrued prior to and through the Closing, whether direct or indirect, absolute or contingent, choate or inchoate, fixed or contingent, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute, or otherwise and whether arising prior to, on, or after the Petition Date (collectively, "Liens, Claims, and Interests"), except for Permitted Encumbrances as expressly provided in the Purchase Agreement, because one or more of the standards set forth in section 363(f)(1) – (5) has been satisfied with regard to each such Lien, Claim, and Interest. Those non-debtor parties with Liens, Claims, and Interests in or with respect to the Property who did not object, or who withdrew their objections to the Motion are deemed to have consented to the sale of the Property free and clear of those non-debtor parties' Liens, Claims and Interests in the Property pursuant to section 363(f)(2) of the Bankruptcy Code. Those non-debtor parties with Liens, Claims, and Interests in or with respect to the Property who objected to the Motion, but who did not withdraw any such objection, can be compelled to accept a monetary satisfaction of their liens, claims, or interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1.    The Motion is hereby granted and approved as set forth herein.

2.	The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.	Any and all objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case, the party asserting the objection or reservation of right is enjoined from taking any action against the Property, the Buyer, its affiliates, or any agent of the foregoing to recover any claim which such person or entity has solely against the Debtor, or its estate. Those parties who did not object or who withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

4.	The sale, and all of the terms and conditions and transactions contemplated by the Purchase Agreement are hereby authorized and approved pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

5.	Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized to consummate the sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement and the Debtor shall at all times act in accordance with the terms thereof.

36

6. The Debtor is authorized to execute and deliver, and empowered to perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Purchase Agreement and consummate the sale pursuant thereto and effectuate the provisions of this Order and the transaction approved hereby, and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or reducing to possession, the Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

7. The consideration provided by the Buyer to the Debtor pursuant to the Purchase Agreement for the Property constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

8. This Order shall be binding in all respects upon (a) the Debtor, (b) its estate, (c) all creditors, (d) all holders of Liens, Claims, and Interests whether known or unknown against or on all or any portion of the Property, (d) the Buyer and all successors and assigns of the Buyer, (e) any trustees subsequently appointed in the Debtor's Chapter 11 case or upon a dismissal or conversion of the case under Chapter 7 of the Bankruptcy Code. This Order and the Purchase Agreement shall inure to the benefit of the Debtor, its estate and creditors, the Buyer, and the respective successors and assigns of each of the foregoing.

37

9.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtor may sell the Property free and clear of any Liens, Claims, and Interests in the Property.

10.    Except for Permitted Encumbrances only as expressly provided in the Purchase Agreement, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing, the Property (and good and marketable title to such Property) and all of the Debtor's rights, title, and interest therein shall be transferred to the Buyer free and clear of all Liens, Claims, and Interests with all such Liens, Claims, and Interests to attach to the net cash proceeds of the sale in the order of their priority, with the same validity, force, and effect which they now have as against the Property, subject to any claims and defenses, setoffs, or rights of recoupment the Debtor may possess with respect thereto.

11.    Notwithstanding the provisions of Bankruptcy Rule 6004 or any applicable provisions of the Local Bankruptcy Rules, this Sale Order shall not be stayed for 14 days after the entry hereof, but shall be effective and enforceable immediately upon entry. Time is of the essence in approving the sale, and the Debtor and the Buyer intend to close the sale as soon as practicable.

12.    The transfer of the Property to the Buyer under this Sale Order is exempt from any transfer or stamp tax under section 1146(a) of the Bankruptcy Code, whether imposed against the Debtor or the Buyer.

13.    Without limiting the other terms of this Sale Order, prior to or upon the Closing of the sale, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their Liens,

38

Claims, and Interests, if any, in the Property as such Liens, Claims, and Interests may have been recorded or may otherwise exist.

14. Except for Permitted Encumbrances, only as expressly provided in the Purchase Agreement, this Sale Order (a) shall be effective as a determination that, upon the Closing, all Liens, Claims, and Interests existing with respect to the Property prior to the Closing have been unconditionally released, discharged, and terminated as to the Buyer and the Property, and that the conveyances described herein have been effected, and (b) shall be binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property.

15. Each and every federal, state, and local governmental agency or department or office is hereby directed to accept this Sale Order and any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement. Without limiting the other provisions of this Sale Order, if any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing interests with respect to the Debtor or the Property shall not have delivered to the Debtor or its designee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments

39

of satisfaction, or releases of all Liens, Claims, and Interests which the person or entity has with respect to the Debtor, the Property, or otherwise, then (a) the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Property and (b) the Buyer and/or the Debtor are hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, and Interests in, against, or with respect to the Debtor or the Property. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

16.     From and after the date hereof, no creditor of the Debtor or other party in interest shall take or cause to be taken any action that would interfere with the transfer of the Property to the Buyer in accordance with the terms of this Sale Order.

17.     This Court hereby retains exclusive jurisdiction, regardless of whether a Chapter 11 plan has been confirmed and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects including, but not limited to, retaining jurisdiction to (a) compel delivery of the Property to the Buyer in accordance with the terms of the Purchase Agreement, (b) resolve any dispute, controversy, or claim arising under or related to the Purchase Agreement, or the

breach thereof and (c) interpret, implement, and enforce the provisions of this Sale Order and resolve any disputes related thereto.

18. Nothing contained in any plan confirmed in this Chapter 11 case or any order of this Court confirming such plan shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Sale Order.

19. The transactions contemplated by the Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code. The Buyer is a good faith Buyer of the Property and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to the Buyer.

20. The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate and its creditors, the Buyer, and any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Debtor's creditors, and all persons and entities receiving notice of the Sale Motion, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any Chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors, its members, or any examiner or receiver.

21. The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such

provision, it being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

22.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

23.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

24.     The Broker's commission in the amount of $200,000 is hereby approved on a final basis allowance, pursuant to 11 U.S.C. §§ 105(a) and 330, and shall be paid to Broker from escrow at closing;

25.     The following Closing Payments shall be paid to the respective creditors at closing from escrow:

- o     Title and Escrow Fees, estimated at no more than $20,000
- o     Broker's Commission - $200,000
- o     Real Property Taxes - $574,368.95 (estimated)
- o     FFB Loan 1295 Payoff - $6,991,700.89
- o     FFB Loan 1400 Payoff - $560,203.29
- o     Mechanic's and Judgment Liens - $73,901.81 (estimated)
- o     Capital One Payoff - $4,894,786.75

///

///

///

42

26.     Any remaining net sales proceeds, after payment of the Closing Payments, shall be disbursed to the Debtor's DIP account and held by the Debtor pending further order of the Court.

| |
|---|
| **THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE** |

# **EXHIBIT B**

# **PURCHASE AGREEMENT**

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into effective as of September 8, 2025 (the "Effective Date") by and between Highland Capital Investments, LLC, a Tennessee limited liability company (the "Purchaser") and Plaza Mariachi, LLC, a Tennessee limited liability company, debtor and debtor-in-possession (the "Seller").

## WITNESSETH:

WHEREAS, Seller is the owner in fee simple of all those parcels of land located at (i) 3941 Nolensville Pike, Nashville, Davidson County, Tennessee 37211, being identified as Map 133, Parcel 145.00 (the "Shopping Center Land"), and (ii) 3955 Nolensville Road, Nashville, Davidson County, Tennessee, being identified as Tax Map 133, Parcel 154 (the "Plaza Mariachi Land" and, collectively, together with the Shopping Center Land, the "Land") as shown as the tax parcel drawing attached hereto and incorporated herein by reference as on Exhibit A;

WHEREAS, Purchaser desires to purchase from Seller (i) the Land, (ii) any improvements located on the Land (the "Improvements"), (iii) Seller's interests in all personal property, if any located on the Shopping Center Land (Seller will maintain the ownership and use of all personal property within the building leased pursuant to the Plaza Mariachi Lease located on the Plaza Mariachi Land. subject to the terms of the Plaza Mariachi Lease), (iv) the Leases listed on the Rent Roll (as each is defined herein), and (v) all easements and any rights, privileges, and easements, if any, appurtenant to the Land (collectively (i)-(v) are referred to herein as the "Property") and Seller desires to sell and transfer the same to Purchaser;

WHEREAS, Seller is the debtor and debtor-in-possession in Chapter 11 Bankruptcy Case No. 3:24-bk-02441 (the "Bankruptcy Case") which is currently pending in the United States Bankruptcy Court for the Middle District of Tennessee, Nashville Division (the "Bankruptcy Court") and the sale of the Property is subject to the entry of an order (the "Approval Order") by the Bankruptcy Court approving this Agreement and the sale of the Property pursuant to 11 U.S.C. § 363.

WHEREAS, concurrently with the Closing (as defined below) of this Agreement, the parties desire to enter into a Lease Agreement between Purchaser and Plaza Mariachi Ventures, LLC ("Tenant"), the material terms of which are set forth on Exhibit D, attached hereto and incorporated by reference, whereby Tenant will lease from the Purchaser the approximately 64,157 square foot space currently operating as Plaza Mariachi (the "Plaza Mariachi Lease").

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1:  PROPERTY TO BE SOLD

1.1     Property to be Sold.  Purchaser agrees to buy and Seller agrees to sell and convey marketable fee title to the Property (as well as to all easements appurtenant thereto), pursuant to the terms and conditions set forth herein.

## ARTICLE 2: PURCHASE PRICE

2.1     Purchase Price. The purchase price for the Property shall be Fourteen Million Two Hundred Fifty Thousand Dollars and No./100ths ($14,250,000.00) (the "Purchase Price") and shall be paid

at Closing (as defined in Section 6.1 herein) by wire transfer received by the closing agent, prior to 3:00 p.m. Central Time, subject to a credit to Purchaser for the Earnest Money (as defined in Section 2.2 below) and closing adjustments as set forth herein.

2.2 <u>Earnest Money; Escrow</u>. Within three (3) business days from the full execution of this Agreement, Purchaser shall deposit with First American Title Insurance Company, Attn: Susan Felts, 511 Union Street, Suite 1600, Nashville, TN 37219, sfelts@firstam.com (the "Title Company"), the sum of One Hundred Thousand Dollars ($100,000) (the "Earnest Money") to be held in escrow by the Title Company. The Earnest Money delivered to the Title Company shall be held in trust for the mutual benefit of the parties subject to the terms and conditions of this Agreement. The Earnest Money shall be deposited by the Title Company in an insured account with a reputable lending institution. If the sale of the Property closes as contemplated, Purchaser will receive the benefit of the Earnest Money. In the event Purchaser terminates this Agreement as a result of a Seller default or as otherwise permitted herein, and notifies the Title Company thereof, the Title Company shall promptly return the Earnest Money to Purchaser.

2.3 <u>No Liability of Holder of Earnest Money</u>. Seller and Purchaser each agree to indemnify Title Company and to hold Title Company harmless from and against any and all liabilities incurred by Title Company in connection with holding the Earnest Money under this Agreement, except to the extent due to Title Company's willful misconduct or gross negligence. In the event of any dispute or question as to the duties of Title Company hereunder, Title Company shall be entitled, in Title Company's sole discretion, without liability to any person having any claim to the Earnest Money, to refuse to perform any act other than to retain the Earnest Money until Title Company's obligations hereunder have been finally determined by a court of competent jurisdiction, or until Title Company has received appropriate instructions in writing signed by the Seller and Purchaser. Seller and Purchaser agree that Title Company may be released of any further obligation related to the Earnest Money by tendering the Earnest Money into a court of competent jurisdiction in an action in the nature of an interpleader for resolution by said court of the ultimate disposition of the Earnest Money. Title Company may act pursuant to the advice of counsel with respect to any matter relating to this Agreement and shall not be liable for any action taken by it in good faith in accordance with such advice, unless caused by the willful misconduct or gross negligence of Title Company. Title Company does not have any interest in the Earnest Money deposited hereunder but is serving as escrow holder only and having only possession thereof.

<u>ARTICLE 3: REPRESENTATIONS, WARRANTIES AND COVENANTS</u>

Seller hereby represents, warrants and covenants to Purchaser as follows, which shall be true as of the Effective Date and as of the Closing Date:

3.1 <u>Authority of Seller</u>. Subject only to Bankruptcy Court approval, Seller has the right and authority to enter into this Agreement and to sell the Property in accordance with the terms and conditions hereof. The individual executing this Agreement on behalf of Seller has the right and authority to bind Seller to the terms and conditions of this Agreement without joinder or approval of any other party.

3.2 <u>Deliveries</u>. Seller, to the extent that such items are in Seller's possession, has already delivered to Purchaser the materials described in <u>Exhibit B</u> attached hereto and incorporated herein by reference and Seller agrees to deliver additional items as set forth in <u>Exhibit B</u> (together, the "Due Diligence Materials").

3.3 <u>Leases</u>.

(a) Except for (i) that certain Master Lease Agreement (the "Master Lease") made as of January 27, 2016 between Seller, as Landlord and PM Realty Nashville, LLC ("PM Realty") as Master

Tenant and (ii) the leases listed on the Rent Roll attached hereto and incorporated herein as <u>Exhibit C</u> (the "Leases"), true, correct and complete copies of which will be delivered to Purchaser pursuant to Section 3.2 hereof, there are no other leasing agreements in place with respect to the Property.

(b)     With respect to the Master Lease and Leases:

      (i)     Seller and PM Realty shall terminate the Master Lease prior to the Closing Date, and, pursuant to the terms of the Leases, such termination shall cause the tenants under the Master Lease to become direct tenants of Seller (and all security deposits for the Leases held by Master Tenant shall be transferred to Seller)

      (ii)     Except as otherwise set forth in the current rent roll for the Property showing all tenants, required rent and CAM payments, delinquencies, lease commencement and termination dates, security deposits, and other such information (the "Rent Roll") or the Leases:

      (A) the rents set forth on the Rent Roll are the actual rents billed by Seller to the tenants of the Property;

      (B) all of the Leases are in full force and effect and none of them have been modified, amended or extended (except following the termination of the Master Lease, to become direct leases between Seller and tenants);

      (C) No renewal or extension options have been granted to tenants;

      (D) No tenant has an option to purchase the Property;

      (E) The rents set forth in the Rent Roll are being billed on a current basis and there are no arrearages in excess of 30 days except as set forth on the aged receivables report(s) provided by Seller as part of the Due Diligence Materials;

      (F) No tenant is entitled to rental concessions or abatements for any period subsequent to the Closing Date;

      (G) There are no security deposits held by Seller other than those set forth in the Rent Roll, which schedule is true and accurate in all material respects.

      (H) There are no leasing commissions which are or may become due or owing with respect to the Leases or otherwise which will not have been paid prior to Closing;

      (I) Seller has not sent written notice to any tenant, occupant or licensee claiming that such tenant is in default, which default remains uncured;

      (J) PM Realty has not sent written notice to any tenant, occupant or licensee claiming that such tenant is in default, which default remains uncured;

(K) No action or proceeding instituted against Seller or PM Realty by any tenant, occupant or licensee of all or part of the Property is presently pending in any court or other tribunal;

(L) True and complete copies of the Master Lease and Leases have been delivered or made available to Purchaser or its counsel;

(M) Seller or PM Realty has performed all of the landlord's material obligations under the Leases; and

(1) Seller has received no notice(s) of any default of the landlord under the Leases that remains pending.

3.4     Agreements and Service Contracts.  Except for the materials to be delivered pursuant to Section 3.2 herein, there are no maintenance agreements, security contracts, service contracts, management agreements or other agreements with respect to the Property.

3.5     No Condemnation; No Litigation.     Seller warrants to Purchaser that there are no condemnation or eminent domain proceedings pending against the Property, and neither Seller nor PM Realty has received any written notice or has any knowledge of any such proposed condemnation or eminent domain proceeding.  Neither Seller nor PM Realty knows of any cause of action or litigation pending against or involving the Property, Seller or PM Realty which would affect the Property, and neither Seller nor PM Realty has received any written notice of any threat of such litigation.

3.6     Environmental Condition of Property.  To Seller's knowledge, and except as may be disclosed in any environmental report or study obtained by, or delivered by Seller to, Purchaser as provided herein, neither Seller nor PM Realty has received any written notification from any governmental authority having jurisdiction over the Property that (a) all or some portion of the Land and the Improvements violates any Environmental Laws (as hereinafter defined); or (b) any Hazardous Substances (as hereinafter defined) have been stored or generated at, released or discharged from or are present upon the Land and the Improvements, except in the ordinary course of business and in accordance with all Environmental Laws. As used herein, "Hazardous Substances" means all hazardous or toxic materials, substances, pollutants, contaminants, or wastes currently identified as a hazardous substance or waste in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (commonly known as "CERCLA"), as amended, the Superfund Amendments and Reauthorization Act (commonly known as "SARA"), the Resource Conservation and Recovery Act (commonly known as "RCRA"), or any other federal, state or local legislation or ordinances applicable to the Land or the Improvements.  As used herein, the term "Environmental Laws" shall mean all federal, state and local environmental laws, rules, statutes, directives, binding written interpretations, binding written policies, ordinances and regulations issued by any governmental authority and in effect as of the date of this Agreement with respect to or which otherwise pertain to or affect the Land or the Improvements, or any portion thereof, the use, ownership, occupancy or operation of the Land or the Improvements, or any portion thereof, or any owner of the Land, and as the same have been amended, modified or supplemented from time to time prior to the date of this Agreement, and any and all rules and regulations which have become effective prior to the date of this Agreement under any and all of the aforementioned laws.

3.7     Master Lease; Operation of the Property.  The Shopping Center Land, together with all easements and any rights, privileges, and easements, if any, appurtenant to the Shopping Center Land (the "Shopping Center Parcel") is leased by Seller to PM Realty pursuant to the Master Lease.  Each of the tenants at the Shopping Center Parcel have subleases with PM Realty.  PM Realty is an affiliate of Seller.

At Closing, Seller and PM Realty will terminate the Master Lease, Seller will then be the direct landlord under the tenant leases, and Seller will assign its rights under all the tenant leases to Purchaser. Seller covenants that neither Seller nor PM Realty will voluntarily create or cause or permit a lien or encumbrance to attach to or on the Property between the Effective Date and Closing. Except as expressly permitted herein, Seller shall operate the Property and cause PM Realty to operate the Shopping Center Parcel in the ordinary course of business prior to the Closing. Seller and PM Realty shall maintain all insurance policies and coverages in place at the Property as of the date hereof through the Closing Date. Seller or PM Realty shall not enter into any new lease at the Property without Purchaser's prior written consent.

3.8     FIRPTA.  Seller is a "United States person" within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Internal Revenue Code of 1986, as amended.

3.9     Governmental Matters.  Except for (i) proceedings involving protest of real estate taxes and (ii) the Bankruptcy Case, there are no pending or ongoing applications or proceedings before any governmental authority filed by Seller (or otherwise known to Seller) with respect to the Property (including any variance, special permit, rezoning or similar proceedings).

3.10    Lease for the Plaza Mariachi Premises.  Within ten (10) days of the Effective Date, Seller shall provide to Purchaser an initial draft of the Plaza Mariachi Lease. During the Inspection Period, Seller and Purchaser shall continue to negotiate the Plaza Mariachi Lease in good faith, and shall come to an agreement on the final form of the Plaza Mariachi Lease prior to the expiration of the Inspection Period. In addition to the other terms negotiated by the parties in good faith during the Inspection Period, the Plaza Mariachi Lease shall contain the material terms as set forth on Exhibit D, attached hereto. Unless this Agreement is earlier terminated in accordance with the terms hereof, Tenant and Purchaser will execute the Plaza Mariachi Lease in the form agreed upon during the Inspection Period simultaneously with Closing.

3.11    Tenant Estoppels and SNDAs.

        a.      Seller covenants and agrees that Seller (i) will use commercially reasonable efforts in good faith to obtain estoppel certificates (the "Tenant Estoppels") from all tenants occupying the Property prior to the Closing Date, substantially in the form attached hereto and incorporated herein by reference as Exhibit E. It shall be a condition to Purchaser's obligation to close hereunder that Seller provide to Purchaser, at or prior to Closing, executed Tenant Estoppels from tenants leasing 80% or more of the rentable square feet of the Property, but under no circumstance shall the failure of this condition be deemed to be a breach or default by Seller.

        b.      Seller will use commercially reasonable efforts in good faith to obtain executed Subordination, Non-Disturbance and Attornment Agreement (an "SNDA") in the form provided by Purchaser's lender from each such tenant at the Property for which an SNDA is reasonably requested by such lender.

3.12    Bankruptcy Court Approval.  If Purchaser does not timely terminate this Agreement prior to the expiration of the Inspection Period, in accordance with Section 4.5 below, the Seller covenants and agrees that Seller will use commercially reasonable efforts in good faith to obtain the entry of the Approval Order, in form and substance reasonably acceptable to the parties, in the Bankruptcy Case within 45 days after the expiration of the Inspection Period. In the event that Seller fails to obtain the entry of the Approval Order prior to the expiration of such 45-day period (or any extension thereof), then Purchaser shall have the right, in its sole discretion, either (i) to extend such period one or more times by successive 45-day periods to allow Seller to obtain the Approval Order, or (ii) to terminate this Agreement by, in either case, providing written notice to Seller within five (5) days after the expiration of such 45-day period or extension thereof, as applicable. In the event of such termination, the sum of $100.00 of the Earnest Money shall be

paid to Seller in full consideration for Purchaser's rights to inspect the Property, to terminate this Agreement and to exercise other rights under this Agreement, and the balance of the Earnest Money shall be promptly returned to Purchaser and this Agreement shall thereafter be of no further force and effect. Such sum is in addition to and independent of any other consideration or payment provided for in this Agreement. In the event that Purchaser exercises the foregoing termination right, Purchaser shall restore any part of the Property damaged by Purchaser and/or its agents to its condition as it existed prior to the inspection, and this obligation shall survive the termination of this Agreement. In addition to the return of the Earnest Money, Purchaser shall be entitled to reimbursement of up to $50,000 in expenses for third party fees related to diligence efforts, studies or inspections, and legal and professional fees related to the negotiation of this Agreement and its exhibits and review of title, survey, and land use matters. In the event that Purchaser exercises the foregoing termination right, Purchaser shall restore any part of the Property damaged by Purchaser and/or its agents to its condition as it existed prior to the inspection, and this obligation shall survive the termination of this Agreement.

       3.13     <u>Survival</u>. The representations and warranties by Seller in this Agreement shall survive the Closing and the recording of the deed for a period of one year after the date of Closing. Notwithstanding any other term or condition hereof, Purchaser shall not be allowed to bring a claim after Closing for the breach of any representation or warranty which Purchaser knew was inaccurate before the Closing.

       3.14     <u>Knowledge of Seller</u>. For purposes of this Agreement, "knowledge" of Seller and of PM Realty shall mean the actual knowledge of Mark Janbakhsh, Manager of Seller and Manager of PM Realty, after reasonable investigation. Mark Janbakhsh is the individual at Seller with the most knowledge of the Property.

       3.15     <u>Limitation on Liability</u>. Seller shall have no liability to Purchaser for any consequential, exemplary, special or punitive damages caused or allegedly caused by, or attributable to, any breach of Seller's representations and warranties. The affiliates, managers, members, officers, employees, agents, and representatives of Seller and their partners, affiliates, managers, members, officers, directors, shareholders, employees, agents and representatives shall have no liability for any actual, consequential, exemplary, special or punitive damages caused or allegedly caused by, or attributable to, any breach of Seller's representations and warranties.

       3.16     <u>AS IS</u>. Subject to the representations and warranties of Seller and PM Realty set forth in this Agreement, and any representations and warranties set forth in the closing documents provided by Seller at Closing, Purchaser understands and acknowledges that Seller has not made and does not make any representation or warranties whatsoever, oral or written, express or implied, to Purchaser with respect to the condition, state of repair or operations of the Property, with respect to the suitability or fitness for Purchaser's intended use or purpose or with respect to the appreciation or income potential of the Property, or any other matter whatsoever. Purchaser further hereby acknowledges and agrees that Purchaser has investigated or will investigate all matters of concern to Purchaser with respect to the Property and that Purchaser is not relying and hereby expressly waives any reliance on any representation or warranty, oral or written, express or implied, of Seller with respect to such matters. Purchaser agrees to purchase the Property and all improvements thereon and mechanical systems therein delivered to Purchaser, "As Is, Where Is" with all faults. The provisions in the foregoing paragraph shall survive the Closing.

<u>ARTICLE 4: TITLE, SURVEY AND INSPECTION PERIOD</u>

       4.1     <u>Title Insurance.</u> Seller shall, at Seller's expense, within 15 days from the Effective Date, obtain and deliver to Purchaser and Purchaser's counsel a commitment for owner's title insurance on the standard ALTA Owner's Policy Form 2011 (the "Title Commitment"). The Title Commitment and the title policy shall be issued by the Title Company. The Title Commitment shall indicate that title is owned by

Seller, free and clear of all liens and encumbrances except for the matters agreed to by Purchaser prior to the expiration of the Inspection Period (the "Permitted Exceptions"). At the Closing, the Title Company (i) shall insure that Purchaser is vested with good and marketable fee simple title to the Property (as well as all easements appurtenant thereto), subject only to the Permitted Exceptions and (ii) shall delete the standard exceptions for mechanics and materialmen's liens, parties in possession, "gap" coverage, and matters which an accurate survey would disclose. Seller agrees to remove, at or before Closing, any monetary liens encumbering the Property, including any mortgages, deeds of trust, security agreements, financing statements, judgment liens or other instruments by which Seller has granted the Property or any part thereof as collateral ("Monetary Liens").

4.2 <u>Survey</u>. Purchaser shall have the option to obtain, at Purchaser's expense, an updated as-built, ALTA survey of the Land and Improvements (the "Survey") certified by a licensed surveyor as of a date which follows the Effective Date. In the event that Purchaser obtains a Survey, Purchaser shall provide a copy of the Survey to the Title Company. In the event that Seller does not ultimately proceed to Closing, Seller will be entitled, but shall not be required, to purchase the Survey by paying Purchaser the amount due to surveyor for preparation of the Survey. In the event the legal description on the Survey differs from the legal description set forth on the deed by which Seller took title to the Property, Seller agrees, at Purchaser's election, to convey by quitclaim deed to Purchaser the legal description of the Land set forth on the Survey.

4.3 <u>Title and Survey Review</u>. If the Title Commitment or Survey shows matters which are not satisfactory to Purchaser, Purchaser shall give Seller written notice thereof within ten (10) days following the last to be received by Purchaser of the Title Commitment or Survey (but in no event later than 40 days after the Effective Date), and shall state in writing its objection to the same. Failure to give such notice within said ten (10) day period shall constitute approval of the Title Commitment and the Survey. Seller agrees, at or before Closing, to (i) satisfy or pay all Monetary Liens and (ii) remove from title any mechanics, materialmen and laborer's liens affecting the Property caused by Seller. Subject to the foregoing, within five (5) days after receipt of such objections, Seller shall have the right, but shall not be obligated, to cure any objections. If Seller shall fail within such five (5) day period to cure or commit to cure such objections, Seller shall not be in default hereunder, and then Purchaser may elect, by written notice to Seller, either to: (i) terminate this Agreement and receive a refund of the Earnest Money or (ii) waive all title defects which Seller is unwilling to cure and proceed with Closing hereunder as if said title defects did not exist. Closing may be extended by Seller for up to 30 days in order for Seller to cure any title or survey defect which it has committed to cure. Notwithstanding the foregoing, and given that the Agreement has not terminated, Purchaser shall have the right to update further the title to the Property and to object to any new title matters which were not present as of the effective date of the Title Commitment, with the same time periods imposed for responses by Seller, and then Purchaser.

4.4 <u>Inspection Period</u>. Subject to the rights of existing tenants at the Property, Purchaser shall have the right, at its option and at its expense, to inspect all aspects of the Property for a forty-five (45) day period commencing on the Effective Date (the "Inspection Period"), which inspection rights include the right to conduct a Phase I environmental inspection of the property, and if recommended by such Phase I environmental inspection, then Purchaser shall also have the right to conduct a Phase II environmental inspection of the Property. Purchaser must give Seller notice of any access to the Property at least two (2) business days in advance and Seller shall have the right to have a representative present at any time that Purchaser is accessing the Property. Notwithstanding anything to the contrary in this Agreement, such notice may be delivered in writing, orally, or via email communication. Purchaser shall have full right of access over, under and above the Property during the Inspection Period, and Seller shall cooperate with Purchaser in the course of Purchaser's investigation. Prior to accessing the Property, Purchaser shall provide evidence reasonably acceptable to Seller that Purchaser has general liability insurance in an amount not less than $1 million per occurrence that names Seller as an additional insured. Purchaser shall indemnify

and hold harmless Seller from any liability, claim or demand (including attorneys' fees) arising out of the acts or omissions of Purchaser or its agents, contractors, employees or other parties conducting activities on the Property on behalf of Purchaser and such obligation shall survive the termination of this Agreement.

4.5     Termination Rights.  In the event that Purchaser determines for any reason whatsoever (including, without limitation, physical, legal, and economic reasons) or for no reason that the Property is not acceptable to Purchaser in Purchaser's sole discretion, Purchaser may terminate this Agreement by providing Seller with written notice prior to the expiration of the Inspection Period.  Upon any such termination, the sum of $100.00 of the Earnest Money shall be paid to Seller in full consideration for Purchaser's rights to inspect the Property, to terminate this Agreement prior to the lapse of the Inspection Period, and to exercise other rights under this Agreement, and the balance of the Earnest Money shall be promptly returned to Purchaser and this Agreement shall thereafter be of no further force and effect.  Such sum is in addition to and independent of any other consideration or payment provided for in this Agreement. In the event that Purchaser exercises the foregoing termination right, Purchaser shall restore any part of the Property damaged by Purchaser and/or its agents to its condition as it existed prior to the Effective Date, and this obligation shall survive the termination of this Agreement.  Failure to notify Seller of termination of this Agreement prior to the expiration of the Inspection Period shall constitute approval of the Property, the Earnest Money shall be "at risk" and non-refundable (except in the event of default by Seller hereunder or any other right of Purchaser to terminate this Agreement as set forth herein).

ARTICLE 5:  CONDITIONS TO CLOSING

5.1     Purchaser's Closing Conditions. Purchaser's obligation to consummate the Closing is expressly conditioned upon the satisfaction of all of the following conditions (which are for the sole benefit of Purchaser) or the waiver of such conditions by Purchaser:

(a)     Entry of the Approval Order in the Bankruptcy Case.

(b)     Seller not being in default under this Agreement, all Monetary Liens shall have been satisfied in accordance with this Agreement, and all of the representations and warranties made by Seller in this Agreement being true, accurate and complete.

(c)     Seller shall deliver to Purchaser (i) the Tenant Estoppels, and (ii) the SNDAs as required by Section 3.12 herein.

(d)     Seller shall deliver to Purchaser evidence of an executed Lease Agreement, acceptable to Purchaser in its discretion, for Suite 3943 of the Shopping Center Parcel, previously leased by El Sinaloense Seafood and Grill (the "Replacement Lease"). The Replacement Lease shall have an initial base rent of no less than $37.50 PSF and shall provide for the tenant to reimburse landlord for taxes, insurance, and operating costs. Prior to execution of the Replacement Lease, Seller shall provide a copy of the draft lease, as well as financials of the proposed tenant and guarantors, for review and approval by Purchaser at its discretion. Upon approval by Purchaser, Seller shall promptly cause the Replacement Lease to be executed by all parties.

In the event that any of the foregoing conditions are not satisfied or waived by Purchaser, then Purchaser may terminate this Agreement by providing Seller with written notice and the portion of the Earnest Money then remaining refundable to Purchaser shall be immediately returned to Purchaser and the parties shall have no further obligations under this Agreement except for the indemnification obligations which survive as set forth herein.

## ARTICLE 6: CLOSING

6.1     Closing. The purchase and sale contemplated herein shall be consummated at the closing (the "Closing") which shall occur within the later to occur of (i) twenty (20) days after the date of expiration of the Inspection Period or (ii) five (5) days after receipt of Bankruptcy Court Approval, or such earlier date as may be mutually agreed upon by Seller and Purchaser. Possession of the Property shall be transferred to Purchaser on the date of the Closing, subject only to the Permitted Exceptions.

6.2     Closing Documents. Seller shall deliver to Purchaser at or before the Closing, the following documents executed by Seller (or as otherwise indicated) (i) a FIRPTA form, (ii) an IRS 1099 form, (iii) a Closing Statement, (iv) a bill of sale conveying the personal property, (v) an assignment and assumption agreement with respect to the Leases and all security deposits thereunder; (vi) an assignment and assumption agreement conveying service contracts Purchaser elects to assume and warranty rights, (vii) a Special Warranty Deed conveying title to the Property and all easements appurtenant thereto to Purchaser, free and clear of all liens, encumbrances, easements and restrictions, except the Permitted Exceptions; (viii) the Plaza Mariachi Lease executed by PM Realty Nashville, LLC or other entity designated by and acceptable to both Seller and Purchaser. At Closing, Seller shall also provide (i) an updated Rent Roll, certified as true, correct and complete as of the Closing Date; (ii) a certification that all of Seller's representations and warranties remain in full force and effect and that the Tenant Estoppels remain in full force and effect as of the date of Closing. Seller shall deliver at or before the Closing an affidavit and indemnity of Seller, in the form required by the Title Company, stating, among other things, that there are no outstanding unpaid bills for which liens can be attached to the Property and in form sufficient for the Title Company to provide "gap" coverage.

6.3     Closing Costs. Seller shall pay (i) the cost of the Title Commitment, and (ii) any title search fees, and the title premium for the owner's policy of title insurance and any costs associated with transferring any warranties to Purchaser. Seller shall also pay at Closing any liens against the Property that are not Permitted Exceptions. Purchaser shall pay (i) the cost of the Survey, (ii) the realty transfer taxes, (iii) the recording costs for the closing documents, (iv) loan title insurance costs and title insurance endorsement costs, and (v) the costs of any environmental site assessment or other inspection reports ordered by the Purchaser related to this transaction. Each party shall pay its own attorney's fees in connection with this transaction. In the event that Purchaser requests that Seller assign to Purchaser at Closing any roof warranty related to the Property, any costs related to such assignment or its approval by the vendor shall be paid by Purchaser.

6.4     Security Deposits. All tenant security and other deposits, prepaid rents and concessions, if any, outstanding under any of the Leases as of Closing shall be credited by Seller to Purchaser at Closing.

6.5     Closing Adjustments. All prorations and adjustments shall be made as of the date of Closing. It is the intention of the parties that all costs and expenses of any nature relating to periods prior to the Closing be the sole responsibility of Seller, without proration. The revenue generated by the Property and all operating expenses, obligations, and other expenses of the Property, except as otherwise expressly provided herein, shall be prorated as of the date of Closing, taking into consideration whether any such revenues and expenses are payable in arrears or in advance. All real property taxes with respect to the Property shall be prorated between the parties as of the date of Closing. Any back taxes assessed for any year prior to the year in which Closing occurs shall be paid in full by Seller at Closing, including all delinquent and/or interest charges. Any expense related to a period subject to proration, the amount of which is not known with certainty at Closing, shall be estimated for purposes of proration and subject to post-closing adjustments as set forth herein.

6.6     Post-Closing Adjustments. Any expense incurred after Closing or notice of which is received by either party after Closing, which expense, if known at Closing would be subject to proration, shall be paid by the party receiving such notice. Seller shall deliver to Purchaser all such statements or notices promptly after receipt and Purchaser shall deliver to Seller, not later than ninety (90) days after Closing, a schedule of all such expenses with appropriate adjustments for estimates made as of the date of Closing. If such schedule shows an amount due Seller from Purchaser, such amount shall be included with the schedule. If such schedule shows an amount due Purchaser, then Seller shall remit such amount within ten (10) days after receipt of the schedule.

## ARTICLE 7: CONDEMNATION AND RISK OF LOSS

7.1     Condemnation. In the event of condemnation or receipt of notice of condemnation or taking of any material part of the Property by governmental authority prior to the date of Closing, Purchaser, at its option, shall have the right to terminate this Agreement, and the Earnest Money, shall be refunded to Purchaser, at which time all parties shall be relieved of all right and responsibilities in this Agreement, at law and in equity. If Purchaser does not elect to terminate this Agreement, as aforesaid, then Closing hereunder shall be consummated as herein provided and without reduction of the Purchase Price, but all condemnation awards or payments shall be assigned to Purchaser. In no event shall Seller be under any duty to restore the Property following condemnation.

7.2     Risk of Loss. The risk of loss or damage to the Property prior to Closing by fire or other casualty, act of God, or any other event shall be upon Seller. If all or a part of the Property is damaged, as aforesaid, prior to Closing and the cost to repair exceeds $50,000, Purchaser, at its option, shall have the right to terminate this Agreement, and thereupon the Earnest Money shall be refunded to Purchaser, at which time all parties shall be relieved of all rights and responsibilities in the Agreement, at law and in equity, except for obligations which survive as set forth herein. If Purchaser does not elect to terminate, as aforesaid, then Closing hereunder shall be consummated as herein provided, with a related reduction of the Purchase Price for an amount agreed upon by both Purchaser and Seller, and all insurance proceeds payable as a result of such damage or casualty, if any, shall be paid to Seller. Purchaser shall handle the related repair and restoration. In no event shall Seller be under any duty to restore the Property following such damage or casualty.

## ARTICLE 8: REAL ESTATE COMMISSION

8.1     Real Estate Commission. At Closing, Seller shall pay a real estate commission to Colliers (Seller's broker) pursuant to a separate written agreement. Purchaser acknowledges that Purchaser has not engaged a broker in connection with this transaction. Subject to the foregoing, Seller and Purchaser represent and warrant to each other that neither Seller nor Purchaser has dealt with, consulted or engaged any real estate broker, or agent in connection with this transaction. Each party (an "Indemnitor") hereby agrees to indemnify and hold the other party (the "Indemnitee") harmless from any liability, claim or demand, cost or expense, including reasonable attorneys' fees the Indemnitee may suffer or incur by reason of the claims of any real estate broker or agent other than as provided above who may claim to have dealt with, consulted or been engaged by Indemnitor in connection with this transaction. Notwithstanding anything contained herein to the contrary, this indemnity shall survive Closing or termination of this Agreement and shall not be subject to the limitations on remedies contained in Article 9 below.

## ARTICLE 9: DEFAULT

9.1     Default by Purchaser. In the event that Purchaser fails to perform under this Agreement, including the failure to consummate the purchase of the Property under the terms stated in this Agreement, Seller, after providing written notice to Purchaser and a three (3) business day period to cure and Purchaser

does not cure such alleged default during such period, shall have the following exclusive remedy: Seller shall terminate this Agreement and Seller shall retain the Earnest Money as liquidated damages. Seller agrees that the remedies set forth in this Agreement are fair and equitable and Seller agrees that it will not assert the lack of mutuality of remedies as a defense in the event of a dispute.

9.2    <u>Default by Seller.</u> If Seller fails to perform under this Agreement, Purchaser shall have the right, after providing written notice to Seller and a three (3) business day period to cure and Seller does not cure such alleged default during such period, either (i) to receive back the Earnest Money, and thereby terminate this Agreement, or (ii) to require specific performance on the part of Seller and receive any attorneys' fees and expenses related to the enforcement of Purchaser's rights under this Agreement, but shall have no other remedies at law or in equity and such rights shall survive the termination of this Agreement. Purchaser agrees that the remedies set forth in this Agreement are fair and equitable and Purchaser agrees that it will not assert the lack of mutuality of remedies as a defense in the event of a dispute.

9.3    <u>Indemnity Survival.</u> The foregoing provisions relating to liquidated damages shall not apply in any way to the indemnities provided by each party to the other pursuant to this Agreement.

## ARTICLE 10: <u>MISCELLANEOUS PROVISIONS</u>

10.1    <u>Completeness; Waiver</u>. This Agreement constitutes the final, exclusive and entire agreement between the parties hereto with respect to the transactions contemplated herein, and it supersedes all prior discussions, understandings or agreements between the parties. Failure by Seller and Purchaser to insist upon or enforce any of its rights hereto shall not constitute a waiver thereof, except as provided herein.

10.2    <u>Assignment and Binding Effect</u>. This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto, their respective heirs, permitted successors, permitted assigns, beneficial owners and representatives. The rights of Purchaser under this Agreement shall be transferable or assignable by Purchaser, in whole or part, without Seller's prior consent. Any assignee of Purchaser shall assume all rights, privileges and obligations of Purchaser hereunder in writing, and shall perform same but Purchaser shall not be released from any obligations hereunder.

10.3    <u>Governing Law; Venue</u>. This Agreement shall be governed by and construed under the laws of the State of Tennessee, and to the extent applicable, Federal Bankruptcy law. The parties agree that the venue for any litigation arising out of this Agreement shall be solely in the Bankruptcy Court. Purchaser consents to the exclusive jurisdiction of the Bankruptcy Court to hear and determine any dispute arising from or related to this Agreement.

10.4    <u>Counterparts/Signatures</u>. To facilitate execution, this Agreement may be executed in as many counterparts as may be required; and it shall not be necessary that the signature of, or on behalf of, each party, or that the signatures of the persons required to bind any party, appear on one or more such counterparts. All counterparts shall collectively constitute a single agreement. Execution evidenced by facsimile signature, electronic signature and/or PDF signature shall be deemed an original for all purposes.

10.5    <u>Notice</u>. All notices, consents and other communications hereunder shall be in writing and shall be (i) personally delivered, (ii) sent by a nationally recognized overnight courier service, or (iii) sent by email with copy by overnight courier, addressed as follows:

(a)    If to Seller, to the address stated below, or to such address as may have been furnished by Seller to Purchaser in writing:

Plaza Mariachi, LLC, debtor and debtor-in-possession
Attn: Mark Janbakhsh
3955 Nolensville Road, Suite 119
Nashville, TN 37211
Email: mark@aufps.com

with copies to:    C. Mark Carver, Esq.
Sherrard Roe Voigt & Harbison, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
Email: mcarver@srvhlaw.com

Todd A. Burgess, Esq.
The Burgess Law Group
3131 E. Camelback Rd., Suite 224
Phoenix, AZ 85016
Email: todd@theburgesslawgroup.com

(b)    If to Purchaser, to the address stated below, or to such other address as may have been furnished by Purchaser to Seller in writing:

Highland Capital Investments, LLC
Attn: Wyatt Woeltje
73 White Bridge Road, Suite 103 #230
Nashville, TN 37205
Email: wyatt@highlandcpt.com

with copies to:    Krieg DeVault LLP
11005 Broadway, Suite D
Crown Point, IN 46307
Email: awoolwine@kdlegal.com

Any such notice, request, consent or other communications shall be deemed received (i) at such time as it is personally delivered by hand, (ii) one business day after deposit with a courier delivery service, or (iii) at such time as received if sent by email. All notices pursuant to this Agreement, whether from Seller to Purchaser or from Purchaser to Seller, will be effective if executed by and sent by the attorney of the party sending such notice. Purchaser and Seller hereby agree that if a notice is given hereunder by counsel, such counsel may communicate directly in writing with all principals, as may be required to comply with the notice provisions of this Agreement.

10.6    <u>Further Assurances</u>. The parties shall execute such additional documents and do such other acts as may be reasonably required to carry out the intent of this Agreement.

10.7    <u>Time of the Essence</u>. Time is of the essence with respect to the performance of each of the covenants and agreements under this Agreement.

10.8    <u>Force Majeure</u>. If a party fails to perform its obligations under this Agreement due to the occurrence of an event of "Force Majeure", the time to complete such obligation shall be extended to the next practical Business Day subsequent to such occurrence. For purposes of this Agreement, the term "Force Majeure" means acts of God (including, but not limited to tornadoes, floods, hurricanes or other

national disasters), compliance with any order of any governmental authority, war, riots, pandemic, or a national emergency, or similar causes not within such party's control.

10.9    Attorneys' Fees. In the event that a party hereto engages attorneys to enforce its rights in connection with or related to this Agreement (including suits after Closing which are based on or related to this Agreement), the prevailing party in any such action shall be entitled to receive from the non-prevailing party its reasonable attorneys' fees and costs, and court costs.

10.10    Business Day. If any date or any period provided in this Agreement ends on a Saturday, Sunday or legal holiday, the applicable period shall be extended to the first business day following such Saturday, Sunday or legal holiday.

10.11    Representation by Counsel. The parties acknowledge that each party to this Agreement has been represented by counsel and such counsel have participated in the negotiation and preparation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring that it be construed or constructed against the party who has drafted or caused the Agreement to be drafted.

10.12    OFAC for Purchaser. Neither Purchaser (which includes its partners, members, principal stockholders, any other constituent entities or persons, overseers, trustees and senior executive officers) nor any direct or indirect constituents of Purchaser that either directly or indirectly own 25% of Purchaser or directly or indirectly control Purchaser have been designated as a "specifically designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website, http://www.treas.gov/ofac/t11 or at any replacement website or other replacement official publication of such list. Purchaser is not in violation of compliance with the regulations of the Office of Foreign Asset Control of the Department of Treasury and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or any other governmental action relating thereto. This representation will be true at all times from the time this is made and until all obligations under the Agreement are satisfied. Purchaser represents that all OFAC information provided by Purchaser to Seller in connection with this Agreement is true and complete.

10.13    OFAC for Seller. Neither Seller (which includes its partners, members, principal stockholders, any other constituent entities or persons, overseers, trustees and senior executive officers) nor any direct or indirect constituents of Seller that either directly or indirectly own 25% of Seller or directly or indirectly control Seller have been designated as a "specifically designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website, http://www.treas.gov/ofac/t11 or at any replacement website or other replacement official publication of such list. Seller is not in violation of compliance with the regulations of the Office of Foreign Asset Control of the Department of Treasury and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or any other governmental action relating thereto. This representation will be true at all times from the time this is made and until all obligations under the Agreement are satisfied. Seller represents that all OFAC information provided by Seller to Purchaser in connection with this Agreement is true and complete.

10.14    1031 Exchange. Purchaser reserves the right to include this transaction as part of one (1) or more Internal Revenue Code Section 1031 tax deferred exchange transactions, at no out-of-pocket cost, expense, or liability to Seller (other than de-minimus legal fees to review the documentation required to effectuate such transactions), including, without limitation, one (1) or more reverse exchange transactions. Seller agrees to cooperate with Purchaser and to execute any and all documents as are reasonably necessary in connection therewith, provided that the closing of the transaction for the conveyance of the Property

shall not be contingent upon, and shall not be subject to, the completion of such exchange, nor shall such affect the Closing Date hereunder. Purchaser shall be obligated to close title to the Property on or before the Closing Date whether or not Purchaser shall have consummated a 1031 exchange transaction.

10.15    Confidentiality. Seller and Purchaser agree that the terms of this Agreement shall remain strictly confidential but the parties shall have the right to disclose the terms of this Agreement to accountants, attorneys, investors, lenders, parties involved with the Bankruptcy Court, and other such parties with a need to know so long as such parties agree to maintain the confidentiality of the terms of this Agreement. No press and other publicity release or communication to the general public in connection with the purchase and sale of the Property will be issued without Purchaser's prior written consent. Notwithstanding the foregoing, in the event that the transaction contemplated by this Agreement closes, then Seller and Purchaser each shall have the right to make public announcements regarding the sale.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the Effective Date.

PURCHASER:                    Highland Capital Investments, LLC,
                              a Tennessee limited liability company

                              By: _Wyatt Woelfe_____

                              Title: _Principal_____


SELLER:                       Plaza Mariachi, LLC,
                              a Tennessee limited liability company
                              Debtor and Debtor-in-Possession

                              By: _Mark Janbakhsh_____
                                    Mark Janbakhsh, Manager

## EXHIBIT A

## DRAWING OF THE TAX MAP



This area is not part of the parcel.

**EXHIBIT B**

**DUE DILIGENCE PROVIDED BY SELLER**

Consistent with the requirements of Section 3.2 herein, Seller, to the extent such items are in Seller's possession, has provided the following to Purchaser:

    (1)    Copies of all leases (including the Master Lease) affecting the Property;

    (2)    A current rent roll for the Property showing all tenants, required rent and CAM payments, delinquencies, lease commencement and termination dates, security deposits, and other such information;

    (3)    Copies of all service contracts, management agreement, or other such documents affecting the Property;

    (4)    Income/Expense operating statements (trailing 2 full years and YTD);

    (5)    CAM reconciliation detail for most recent year;

    (6)    A copy of the current title policy for the Property;

    (7)    The latest survey of the Property;

    (8)    Copies of the most recent environmental reports related to the Property;

    (9)    To the extent they exist, copies of all site plans, engineering plans, landscape plans and permits related to the Property;

    (10)    Copies of real estate tax assessments and bills covering the immediately preceding two years;

    (11)    Copies of utility bills for the prior two years;

    (12)    List of any pending or threatened litigation related to the Property (other than the Bankruptcy case), if any; and

    (13)    To the extent that they exist, copies of all warranties affecting the Property including, without limitation, roof, equipment and HVAC warranties.

In addition, during the Inspection Period, Seller shall furnish Purchaser with copies of any other information which may be reasonably requested by Purchaser, within a reasonable amount of time before the end of the Inspection Period. Purchaser agrees that upon expiration of the Inspection Period, or the earlier termination thereof, Purchaser will return all documents furnished to Purchaser from Seller during the Inspection Period in the event the sale contemplated herein is not consummated.

Seller's obligation to deliver the above-described items to Purchaser may, without limitation, be satisfied by providing Purchaser with access to an internet site containing electronic copies of the items to be delivered by Seller.

**EXHIBIT C**

**RENT ROLL**

[See Attached]

## EXHIBIT D

## PLAZA MARIACHI MATERIAL LEASE TERMS

Pursuant to Section 3.10 of this Agreement, Purchaser and Seller desire to set forth certain material terms which shall be included in the final form of the Plaza Mariachi Lease. The terms set forth below shall be contained in the Plaza Mariachi Lease, and the parties shall negotiate in good faith to reach agreement on any additional terms to the Plaza Mariachi Lease is accordance with the terms of this Agreement.

1.    **Base Rent**. Base Rent shall start at $50,000 per month / $600,000 per year and shall be subject to a 10% increase after every 5-year period of the Term, as the same may be extended as set forth below.

2.    **Term**. The initial term shall be for a period of 15 years.

3.    **Extension Options**. Tenant shall have 3 renewal options to extend the lease, each for a period of 5 years.

4.    **Triple Net Lease**. Tenant shall reimburse Landlord for Tenant's proportionate share of insurance, taxes, and operating expenses.

5.    **Tenant and Guaranty.** Tenant shall be Plaza Mariachi Ventures, LLC, a Tennessee limited liability company. The lease will be guaranteed by Diane Janbakhsh, Z-Bar, LLC, a Tennessee limited liability company, PM Realty Nashville, LLC, a Tennessee limited liability company, Plaza Mariachi LLC, a Tennessee limited liability company, and all other related entities associated with the operations of Plaza Mariachi. In the event that tenant does not commit a default under the lease for the first seven and one-half (7.5) years of the term of the lease, then Diane Janbakhsh will be released from their guaranty.

6.    **Operations.** Tenant shall have the right to continue the leases with the current occupants and users in the 64,157 square foot space currently operating as Plaza Mariachi and to amend, terminate, and/or extend any such existing lease and to enter into leases with other parties in the sole discretion of tenant. Tenant shall have the right to operate at all hours, subject to compliance with applicable law. Tenant shall continue to maintain the entire parking lot of the Shopping Center Parcel and the Plaza Mariachi Land, including but not limited to, landscaping, snow removal, and trash removal, at its sole cost and expense. Notwithstanding the foregoing, Landlord shall be responsible for paving, striping, lighting/poles, and any capital expense items related to the parking and drive areas.

7.    **Right Of First Refusal.** Tenant shall have the right of first refusal to purchase the Shopping Center Land and the Plaza Mariachi Land, to be further defined within the Lease.

8.    **Mutual Restrictions**. The Plaza Mariachi Lease shall include the following rights and restrictions:

(a)    The Shopping Center Parcel shall be subject to the rights and restrictions as follows for as long as the Plaza Mariachi Lease remains in full force and effect, except as otherwise stated herein:

i.      In connection with the Día de la Independencia celebration (Mexican Independence Day) occurring no more than one (1) day per year with setup and breakdown the day before and day after the event, most of the parking area of the Shopping Center Parcel may be used by the tenant of the Plaza Mariachi Land. The tenant of the Plaza Mariachi Land shall provide landlord with at least seven days' advance written notice of any such use.

ii.      In no event shall the landlord have the right to charge for parking on the Shopping Center Parcel.

iii.      Immediately following the Día de la Independencia celebration (or any other permitted festival or event), the tenant of the Plaza Mariachi Land shall immediately clean the parking lot, shall make any repairs to the parking lot required from the use of the parking lot during such event, and shall pay all the cost of such cleaning or repairs together with any common area costs associated with such event. If such cleaning and repair (if required) is not completed within three (3) business days following the event, the landlord may, after providing the tenant of the Plaza Mariachi Land with notice and an additional day to cure, undertake such required cleaning or repair at the Tenant's sole cost and expense, based on commercially reasonable costs.

iv.      The owner of the Shopping Center Parcel may not use the name "Plaza Mariachi" except in connection with use to describe the "Shops at Plaza Mariachi" for the Shopping Center Parcel only, and not for any other real properties, and this provision shall survive termination of the Plaza Mariachi Lease.

(b)      The Plaza Mariachi Land shall be subject to the rights and restrictions as follows:

i.      Subject to compliance with all applicable laws, the tenant of the Plaza Mariachi Land will have the right to maintain traffic barriers near the front of the 64,157 square foot building entrance for safety and security purposes, however, such barriers shall not block the flow of pedestrian traffic.

ii.      The tenant of the Plaza Mariachi Land will have the right to use the LED sign adjacent to Nolensville Pike and shall maintain, repair and replace such LED sign at its sole cost and expense. In the event that the tenant of the Plaza Mariachi Land fails to maintain the LED sign in operational condition for a period of 180 consecutive days or more, then the landlord shall have the right to use, maintain, repair and replace the LED sign at the expense of the tenant. Such 180-day may be extended by the tenant of the Plaza Mariachi Land in the event of a casualty affecting the Plaza Mariachi Land or a force majeure event such as acts of God (including, but not limited to tornadoes, floods, hurricanes or other national disasters), compliance with any order of any governmental authority, war, riots, pandemic, or a national emergency, or similar causes not within such party's control.

iii. The tenant of the Plaza Mariachi Land will have the right to erect, maintain, repair and replace family friendly thematic lighting around the improvements on the Plaza Mariachi Land at its sole cost and expense and after obtaining the written consent of the landlord, which consent will not be unreasonably withheld.

iv. The Plaza Mariachi Land may be used for events, concerts, festivals, community events, vendors, flea markets, farmers markets, and similar events, subject to approval from landlord, which approval will not be unreasonably withheld. Without limiting the foregoing, the Plaza Mariachi Land may be used in connection with the Día de la Independencia celebration (Mexican Independence Day). Tenant and landlord will review and approve the event schedule on a regular basis (no less often than quarterly) with the expectation of approval of a flea market every week, musical events approximately 25 times a year (including concerts in the triangle area at the left rear/side of the property), and a farmer's market in season.

v. The tenant of the Plaza Mariachi Land will have the right to use ingress and egress through the parking and drive areas on the area of the Shopping Center Parcel located near the rear on the right side when facing Plaza Mariachi. Subject to the advanced review and written approval of the landlord, which approval shall not be unreasonably withheld, the improvements on the Shopping Center Parcel in such area (such as ramps and loading docks) may be modified, removed or replaced at the discretion and cost of the tenant of the Plaza Mariachi Land.

vi. Subject to compliance with all applicable laws, the Plaza Mariachi Land may be modified to construct a pavilion or similar improvements in the promenade area including the green turf area and to make other changes, following the review and advance written approval of the landlord.

vii. The tenant of the Plaza Mariachi Land shall have the exclusive right to use the name "Plaza Mariachi" at this property and any other properties determined by such party, except in connection with use by the owner of the Shopping Center Parcel to describe the "Shops at Plaza Mariachi" for the Shopping Center Parcel only and not for any other real properties, and this provision shall survive termination of the Plaza Mariachi Lease.

viii. The tenant of the Plaza Mariachi Land expects to make interior modifications to the improvements on the Plaza Mariachi Land (the "Tenant Work") from time to time in connection with the uses and requirements of the subtenants in the space. Tenant may complete Tenant Work without Landlord's advance written consent if: (i) the aggregate cost of the Tenant Work is not in excess of $100,000, (ii) the Tenant Work does not involve structural modifications, and (iii) the Tenant Work will not require a building permit under applicable law. Any other modifications shall be subject to landlord's prior approval which shall not be unreasonably withheld, conditioned, or delayed.

**EXHIBIT E**

**TENANT ESTOPPEL CERTIFICATE FORM**

**ESTOPPEL CERTIFICATE**

**RE:**   **Suite** _____

         _____

         _____, _____

**Lease Agreement dated** _____ (the " **Lease** ")

**BETWEEN PM Realty Nashville, LLC (" Landlord" ) and** _____ (" **Tenant** ")

Tenant hereby certifies to Landlord and to _____, as the potential Purchaser of certain real property and improvements ("Property") of which Tenant leases a portion (the "Premises") pursuant to the Lease as follows as of the date hereof:

1.     The Lease is unmodified. The Lease is in full force and effect.

2.     Tenant took possession of a portion of the Premises on _____, 20___ and all Rent due under the Lease has been paid to _____ 1, 2025.

3.     The Term of the Lease commenced on _____, 200___ and expires on _____, 200____, subject to _____ year renewal options.

4.     Tenant is leasing _____ square feet. Tenant has accepted possession of the Premises and all improvements required by the terms of the Lease to be made by Landlord have been completed to the satisfaction of Tenant.

5.     Landlord has not defaulted (beyond any applicable notice and/or cure period) in its obligations under the Lease to Tenant.

6.     Tenant, as of this date, has no current charge, lien, cause of action, claim or right of offset against Landlord under the Lease or otherwise, against rents or other charges due or to become due under the Lease.

7.     The present annual Base Rent is $_____, payable in equal monthly installments. No such payments by Tenant are past due. No Rent under the Lease has been paid more than 30 days in advance of its due date.

8.     Tenant is paying a monthly reimbursement for common area maintenance charges, taxes, insurance and other such expenses equal to $_____. No such payments by Tenant are past due.

9.     Tenant has provided a security deposit in the amount of $_____.

10. The Lease is not subject to any rental concessions that have not expired or leasing brokerage commissions.

11. Tenant has no purchase rights in connection with the Lease, the Premises or the Property.

12. To the best of Tenant's knowledge, Tenant is in full compliance with all federal, state and local laws, ordinances, rules, and regulations affecting its use of the Premises and the Property, including, but not limited to, those laws, ordinances, rules or regulations relating to hazardous or toxic materials. Tenant has never permitted or suffered, nor does the Tenant have any knowledge of, the generation, manufacture, treatment, use storage, disposal or discharge of any hazardous, toxic or dangerous waste, substance or material in, on, under or about the Premises or the Property or any adjacent premises or property in violation of any federal, state or local law, ordinance, rule or regulation.

13. Tenant agrees to be bound by the representations and warranties made by Tenant in this Estoppel Certificate.

Executed as of _____, 2025.

_____

By: _____

Title: _____

Docusign Envelope ID: 99B9083F-C65E-4F27-B86A-83CDBD9C5602

## FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

THIS FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "Amendment") is made and entered into as of October 16, 2025 (the "Effective Date"), by and between Highland Capital Investments, LLC, a Tennessee limited liability company (the "Purchaser") and Plaza Mariachi, LLC, a Tennessee limited liability company, debtor and debtor-in-possession (the "Seller").

### WITNESSETH:

**WHEREAS**, Seller and Purchaser entered into that certain Agreement for Purchase and Sale dated effective as of September 8, 2025 (the "Agreement"), with respect to certain real property, personal property, and other rights as more particularly described in the Agreement (the "Property");

**WHEREAS**, the parties hereto desire to amend the Agreement as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and recitals hereinabove set forth, which are incorporated herein by reference, and the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Agreement as follows:

1. Terms defined in the Agreement shall have the same meanings in this Amendment unless specifically modified herein.

2. Purchaser and Seller agree that at Closing Purchaser shall receive a credit against the Purchase Price for the amount of $800,000 in connection with the Master Lease rent reserve. Purchaser and Seller agree that the Master Lease will state that Tenant will receive a credit for the total amount of $800,000 against the rent due and payable under the Master Lease beginning at the commencement of the fourteenth (14th) year of the Term of Lease and continuing until Tenant has received the full credit of $800,000 (the "Lease Credit"). Purchaser agrees that the Master Lease will not require a security deposit from Tenant. Purchaser and Seller agree that in the event that Seller (or a designee controlled by Seller or its affiliates) purchases the Plaza Mariachi Parcel from Purchaser prior to Tenant receiving all of the Lease Credit, then the purchasing entity shall receive a credit against the purchase price up to the amount of the Lease Credit that has not been taken and in such an event Tenant shall not receive any more of the Lease Credit.

3. Except as otherwise expressly set forth above, Seller and Purchaser hereby acknowledge and agree that all other terms of the Agreement are hereby confirmed and ratified and shall remain unchanged and in full force and effect. In the event of conflict or inconsistency between the provisions of this Amendment and any provisions of the Agreement, the provisions of this Amendment shall govern.

4. The Agreement, as amended by this Amendment, constitutes the entire agreement and understanding of the parties with respect to the Property and supersedes all prior agreements,

negotiations and discussions, whether oral or written, relating thereto. This Amendment shall be governed by the laws of the State of Tennessee. This Amendment may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, modification or discharge is sought.

5.    This Amendment may be executed in separate counterparts and it shall be fully executed when each party whose signature is required has signed at least one (1) counterpart even though no one (1) counterpart contains the signatures of all of the parties to this Amendment. This Amendment shall extend to, inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. Facsimile copies or copies of this Amendment delivered by electronic mail as a .pdf attachment to such electronic mail shall have the same force and effect as originals.

(Signatures appear on following page)

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed by such party as of the Effective Date.

PURCHASER:

Highland Capital Investments, LLC,
a Tennessee limited liability company

By: _Wyatt Woelfle_____

Title: _Member_____

SELLER:

Plaza Mariachi, LLC,
a Tennessee limited liability company
Debtor and Debtor-in-Possession

By: _Mark Janbakhsh_____
　　Mark Janbakhsh, Manager

3

## SECOND AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

THIS SECOND AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "Amendment") is made and entered into as of October 21, 2025 (the "Effective Date"), by and between Highland Capital Investments, LLC, a Tennessee limited liability company (the "Purchaser") and Plaza Mariachi, LLC, a Tennessee limited liability company, debtor and debtor-in-possession (the "Seller").

### WITNESSETH:

WHEREAS, Purchaser and Seller entered in that certain Purchase and Sale Agreement dated effective as of September 8, 2025 (the "Original Agreement"), as amended by that certain First Amendment to Agreement of Purchase and Sale, by and between Purchaser and Seller, dated as of October 16, 2025 (the "First Amendment", and, together with the Original Agreement, the "Agreement"), with respect to certain real property, personal property, and other rights as more particularly described in the Agreement (the "Property");

WHEREAS, the parties hereto desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the premises and recitals hereinabove set forth, which are incorporated herein by reference, and the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Agreement as follows:

1.  **Defined Terms**. Terms defined in the Agreement shall have the same meanings in this Amendment unless specifically modified herein.

2.  **Inspection Period**. The Inspection Period is hereby extended and will expire on November 6, 2025 at 5:00 p.m. Central Time.

3.  **Ratification**. Except as otherwise expressly set forth above, Seller and Purchaser hereby acknowledge and agree that all other terms and conditions of the Agreement are hereby confirmed and ratified and shall remain unchanged and in full force and effect. In the event of conflict or inconsistency between the provisions of this Amendment and any provisions of the Agreement, the provisions of this Amendment shall govern.

4.  **Entire Agreement**. The Agreement, as amended by this Amendment, constitutes the entire agreement and understanding of the parties with respect to the Property and supersedes all prior agreements, negotiations and discussions, whether oral or written, relating thereto. This Amendment shall be governed by the laws of the State of Tennessee. This Amendment may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, modification or discharge is sought.

5.  **Counterparts**. This Amendment may be executed in separate counterparts and it shall be fully executed when each party whose signature is required has signed at least one (1) counterpart even though no one (1) counterpart contains the signatures of all of the parties to this Amendment. This Amendment shall extend to, inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. Facsimile copies or copies of this Amendment delivered by electronic mail as a .pdf attachment to such electronic mail shall have the same force and effect as originals.

1

16447\002\4451538.v2

Docusign Envelope ID: 8666AC08-B57D-49C7-BEBA-6984796410D1

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed by such party as of the Effective Date.

PURCHASER:

Highland Capital Investments, LLC,
a Tennessee limited liability company

By: _____
Wyatt Woelfle
4516AB9E1EF7439...

Title: Member _____

SELLER:

Plaza Mariachi, LLC,
a Tennessee limited liability company
Debtor and Debtor-in-Possession

By: _____
Mark Janbakhsh, Manager

16447\002\4451538.v2

Docusign Envelope ID: 31B4E181-59CF-485B-949B-73989C8AFB44

# THIRD AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

THIS THIRD AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "Amendment") is made and entered into as of November 4, 2025 (the "Effective Date"), by and between HC Plaza, LLC, a Tennessee limited liability company (the "Purchaser") and Plaza Mariachi, LLC, a Tennessee limited liability company, debtor and debtor-in-possession (the "Seller").

## WITNESSETH:

**WHEREAS**, Highland Capital Investments, LLC and Seller entered in that certain Purchase and Sale Agreement dated effective as of September 8, 2025 (the "Original Agreement"), as amended by that certain First Amendment to Agreement of Purchase and Sale, by and between Purchaser and Seller, dated as of October 16, 2025 (the "First Amendment"), and as further amended by that certain Second Amendment to Agreement of Purchase and Sale, by and between Purchaser and Seller, dated as of October 21, 2025 (the "Second Amendment", and, together with the Original Agreement and the First Amendment, the "Agreement"), with respect to certain real property, personal property, and other rights as more particularly described in the Agreement (the "Property");

**WHEREAS**, Highland Capital Investments, LLC assigned its rights as purchaser under the Agreement to HC Plaza, LLC by that certain Assignment of Purchase and Sale Agreement dated October 26, 2025;

**WHEREAS**, the parties hereto desire to amend the Agreement as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and recitals hereinabove set forth, which are incorporated herein by reference, and the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Agreement as follows:

1. **Defined Terms**. Terms defined in the Agreement shall have the same meanings in this Amendment unless specifically modified herein.

2. **Section 2 of the First Amendment Deleted**. Section 2 of the First Amendment as set forth below is hereby deleted in its entirety.

Purchaser and Seller agree that at Closing Purchaser shall receive a credit against the Purchase Price for the amount of $800,000 in connection with the Master Lease rent reserve. Purchaser and Seller agree that the Master Lease will state that Tenant will receive a credit for the total amount of $800,000 against the rent due and payable under the Master Lease beginning at the commencement of the fourteenth (14th) year of the Term of Lease and continuing until Tenant has received the full credit of $800,000 (the "Lease Credit"). Purchaser agrees that the Master Lease will not require a security deposit from Tenant. Purchaser and Seller agree that in the event that Seller (or a designee controlled by Seller or its affiliates) purchases the Plaza Mariachi Parcel from Purchaser prior to Tenant receiving all of the Lease Credit, then the purchasing entity shall receive a credit against the purchase price up to the amount of the Lease Credit that has not been taken and in such an event Tenant shall not receive any more of the Lease Credit

3. **Purchase Price Reduction**. Purchaser and Seller hereby agree that the Purchase Price is reduced by the amount of $800,000 and is now $13,450,000.

1

16447\002\4455258.v1

4.    **Purchaser's Waiver of Inspection Period Termination Right**. Purchaser hereby waives any right to terminate the Agreement during the Inspection Period.

5.    **Ratification**.  Except as otherwise expressly set forth above, Seller and Purchaser hereby acknowledge and agree that all other terms and conditions of the Agreement are hereby confirmed and ratified and shall remain unchanged and in full force and effect.  In the event of conflict or inconsistency between the provisions of this Amendment and any provisions of the Agreement, the provisions of this Amendment shall govern.

6.    **Entire Agreement**.  The Agreement, as amended by this Amendment, constitutes the entire agreement and understanding of the parties with respect to the Property and supersedes all prior agreements, negotiations and discussions, whether oral or written, relating thereto.  This Amendment shall be governed by the laws of the State of Tennessee.  This Amendment may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, modification or discharge is sought.

7.    **Counterparts**.  This Amendment may be executed in separate counterparts and it shall be fully executed when each party whose signature is required has signed at least one (1) counterpart even though no one (1) counterpart contains the signatures of all of the parties to this Amendment.  This Amendment shall extend to, inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.  Facsimile copies or copies of this Amendment delivered by electronic mail as a .pdf attachment to such electronic mail shall have the same force and effect as originals.

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be executed by such party as of the Effective Date.

PURCHASER:          HC Plaza, LLC,
                    a Tennessee limited liability company

                    By: _Wyatt Woolfe_____
                    ⌐DocuSigned by:
                    └45164B9E1EF7439...

                    Title: ___Manager_____

SELLER:             Plaza Mariachi, LLC,
                    a Tennessee limited liability company
                    Debtor and Debtor-in-Possession

                    By: _____
                    Mark Janbakhsh, Manager

# EXHIBIT C

## FFB LOAN CALCULATIONS

| | | | |
|---|---|---|---|
| Petition Date | 7/1/2024 | Principal | $7,024,339.04 |
| | | Interest | $200,938.80 |
| | | Attorneys' Fees | $52,435.70 |
| | | | $7,277,713.54 |
| Interest Rate | | 5.25% | |

| Date | Description | Advance (+) | Payment (−) | Days Since Prior | Interest Accrued (+) | Principal Balance | Interest Balance | Fees |
|---|---|---|---|---|---|---|---|---|
| 7/1/24 | Balance Forward | | | | | $7,024,339.04 | $200,938.80 | $52,435.70 |
| 8/6/24 | Interest | | | 36.00 | $36,372.60 | | $237,311.40 | |
| 8/6/24 | Payment | | $34,323.46 | | | | $202,987.94 | |
| 9/5/24 | Interest | | | 30.00 | $30,310.50 | | $233,298.45 | |
| 9/5/24 | Payment | | $34,323.46 | | | | $198,974.99 | |
| 10/16/24 | Interest | | | 41.00 | $41,424.36 | | $240,399.34 | |
| 10/16/24 | Payment | | $34,323.46 | | | | $206,075.88 | |
| 11/19/24 | Interest | | | 34.00 | $34,351.90 | | $240,427.79 | |
| 11/19/24 | Payment | | $55,000.00 | | | | $185,427.79 | |
| 12/10/24 | Interest | | | 21.00 | $21,217.35 | | $206,645.14 | |
| 12/10/24 | Payment | | $55,000.00 | | | | $151,645.14 | |
| 1/13/25 | Interest | | | 34.00 | $34,351.90 | | $185,997.05 | |
| 1/13/25 | Payment | | $55,000.00 | | | | $130,997.05 | |
| 2/10/25 | Interest | | | 28.00 | $28,289.80 | | $159,286.85 | |
| 2/10/25 | Payment | | $55,000.00 | | | | $104,286.85 | |
| 3/10/25 | Interest | | | 28.00 | $28,289.80 | | $132,576.65 | |
| 3/10/25 | Payment | | $55,000.00 | | | | $77,576.65 | |
| 4/11/25 | Interest | | | 32.00 | $32,331.20 | | $109,907.86 | |
| 4/11/25 | Payment | | $55,000.00 | | | | $54,907.86 | |
| 5/12/25 | Interest | | | 31.00 | $31,320.85 | | $86,228.71 | |
| 5/12/25 | Payment | | $55,000.00 | | | | $31,228.71 | |
| 6/10/25 | Interest | | | 29.00 | $29,300.15 | | $60,528.87 | |
| 6/10/25 | Payment | | $55,000.00 | | | | $5,528.87 | |
| 7/10/25 | Interest | | | 30.00 | $30,310.50 | | $35,839.37 | |
| 7/10/25 | Payment | | $55,000.00 | | | | $0.00 | $33,275.07 |
| 8/13/25 | Interest | | | 34.00 | $34,351.90 | | $34,351.90 | |
| 8/13/25 | Payment | | $55,000.00 | | | | $0.00 | $12,626.98 |
| 9/10/25 | Interest | | | 28.00 | $28,289.80 | | $28,289.80 | |
| 9/10/25 | Payment | | $55,000.00 | | | $7,010,255.82 | $0.00 | $0.00 |
| 10/10/25 | Interest | | | 30.00 | $30,249.73 | | $30,249.73 | |
| 10/10/25 | Payment | | $55,000.00 | | | $6,985,505.55 | $0.00 | |
| 11/11/25 | Interest | | | 32.00 | $32,152.46 | | $32,152.46 | |
| 11/11/25 | Payment | | $55,000.00 | | | $6,962,658.02 | $0.00 | |
| 12/10/25 | Interest | | | 29.00 | $29,042.87 | | $29,042.87 | |
| | | | | | | | $6,991,700.89 | |

FFB Loan 1400 Calculation

| | | | | |
|---|---|---|---|---|
| Petition Date | 7/1/2024 | Principal | $907,446.75 | |
| | | Interest | $15,729.08 | |
| | | Attorneys' Fees | $2,750.00 | |
| | | | $925,925.83 | |
| Interest Rate | | | 4.75% | |

| Date | Description | Advance (+) | Payment (−) | Days Since Prior | Interest Accrued (+) | Principal Balance | Interest Balance | Fees |
|---|---|---|---|---|---|---|---|---|
| 7/1/24 | Balance Forward | | | | | $907,446.75 | $15,729.08 | $2,750.00 |
| 12/15/24 | Interest | | | 167.00 | $19,721.43 | | $35,450.51 | |
| 12/15/24 | Payment | | $35,000.00 | | | | $450.51 | |
| 1/15/25 | Interest | | | 31.00 | $3,660.86 | | $4,111.37 | |
| 1/15/25 | Payment | | $35,000.00 | | | $879,308.12 | $0.00 | $0.00 |
| 2/15/25 | Interest | | | 31.00 | $3,547.35 | | $3,547.35 | |
| 2/15/25 | Payment | | $35,000.00 | | | $847,855.47 | $0.00 | |
| 3/15/25 | Interest | | | 28.00 | $3,089.45 | | $3,089.45 | |
| 3/15/25 | Payment | | $35,000.00 | | | $815,944.91 | $0.00 | |
| 4/15/25 | Interest | | | 31.00 | $3,291.72 | | $3,291.72 | |
| 4/15/25 | Payment | | $35,000.00 | | | $784,236.64 | $0.00 | |
| 5/15/25 | Interest | | | 30.00 | $3,061.75 | | $3,061.75 | |
| 5/15/25 | Payment | | $35,000.00 | | | $752,298.38 | $0.00 | |
| 6/15/25 | Interest | | | 31.00 | $3,034.96 | | $3,034.96 | |
| 6/15/25 | Payment | | $35,000.00 | | | $720,333.34 | $0.00 | |
| 7/15/25 | Interest | | | 30.00 | $2,812.26 | | $2,812.26 | |
| 7/15/25 | Payment | | $35,000.00 | | | $688,145.60 | $0.00 | |
| 8/15/25 | Interest | | | 31.00 | $2,776.15 | | $2,776.15 | |
| 8/15/25 | Payment | | $35,000.00 | | | $655,921.75 | $0.00 | |
| 9/15/25 | Interest | | | 31.00 | $2,646.15 | | $2,646.15 | |
| 9/15/25 | Payment | | $35,000.00 | | | $623,567.90 | $0.00 | |
| 10/15/25 | Interest | | | 30.00 | $2,434.48 | | $2,434.48 | |
| 10/15/25 | Payment | | $35,000.00 | | | $591,002.38 | $0.00 | |
| 11/15/25 | Interest | | | 31.00 | $2,384.25 | | $2,384.25 | |
| 11/15/25 | Payment | | $35,000.00 | | | $558,386.63 | $0.00 | |
| 12/10/25 | Interest | | | 25.00 | $1,816.67 | | | |
| | | | | | | $560,203.29 | | |

**EXHIBIT D**

**PRELIMINARY TITLE REPORT**


**Transaction Identification Data, for which the Company assumes no liability as set forth in Commitment Condition 5.e.:**

Issuing Agent: First American Title Insurance Company National Commercial Services
Issuing Office: 511 Union St., Ste. 1600, Nashville, TN 37219
Issuing Office's ALTA® Registry ID: 1105306
Commitment Number: NCS-1276880-NAS
Issuing Office File Number: NCS-1276880-NAS
Property Address: 3941 Nolensville Pike and, 3955 Nolensville Road, Nashville, TN
Revision Number:

### Amend and Revision: 10/02/2025
Schedule A: Brought Effective Date Forward; Revised Legal Description in Exhibit A.
Schedule B, Part I: Revised Item No. 10.
Schedule B, Part II: Revised Item No. 10.

### SCHEDULE A

1.  Commitment Date: September 26, 2025 at 7:30 AM

2.  Policy to be issued:
    a.  ALTA® Extended Owner's Policy
        Proposed Insured: HC Plaza, LLC, a Tennessee limited liability company
        Proposed Amount of Insurance: $14,250,000.00
        The estate or interest to be insured: See Item 3 below
    b.  ALTA® Extended Loan Policy
        Proposed Insured: A Natural Person or Legal Entity to be Designated
        Proposed Amount of Insurance: $1,000.00
        The estate or interest to be insured: See Item 3 below

3.  The estate or interest in the Land at the Commitment Date is:

    Fee Simple

4.  The Title is, at the Commitment Date, vested in:

    Plaza Mariachi, LLC, a Tennessee limited liability company

5.  The Land is described as follows:

    See Exhibit A attached hereto and made a part hereof

---

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.

**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Form 50129447 (6-14-22)                                                                                          Page 1 of 12



Issuing Office File Number: 3941 Nolensville Pike

## SCHEDULE B, PART I—Requirements

All of the following Requirements must be met:

1.  Pay the agreed amount for the estate or interest to be insured.

2.  Pay the premiums, fees, and charges for the Policy to the Company.

3.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

    a.  Warranty Deed in a form approved by the Company, conveying the interest in the Land described in Schedule A.

    b.  Deed of Trust in a form approved by the Company, conveying interest in the Land to secure the loan.

5.  Pay all taxes and or assessments, levied and assessed against the Land, which are due and payable.

6.  The Company must be furnished with the following for review in regard to Plaza Mariachi, LLC, a limited liability company:

    a.  A copy of the Articles of Organization and all amendments thereto;
    b.  A copy of the existing operating agreement and all amendments thereto;
    c.  A current Certificate of Good Standing, or its equivalent, from the State of origin and the State of Tennessee;
    d.  Resolutions/Consents authorizing the transaction contemplated in this Commitment and designating the authorized signatory;
    e.  The Company may require additional documentation for each entity comprising any tier of ownership of the said limited liability company.

7.  The Company must be furnished with the following for review in regard to HC Plaza, LLC, a limited liability company:

    a.  A copy of the Articles of Organization and all amendments thereto;
    b.  A copy of the existing operating agreement and all amendments thereto;
    c.  A current Certificate of Good Standing, or its equivalent, from the State of origin and the State of Tennessee;
    d.  Resolutions/Consents authorizing the transaction contemplated in this Commitment and designating the authorized signatory;
    e.  The Company may require additional documentation for each entity comprising any tier of

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*
**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.
**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Case 3:24-bk-04457 Doc 56-4 Filed 11/05/25 Entered 11/05/25 17:12:07 Desc Main Document Page 79 of 103


ownership of the said limited liability company.

8. This Company must be provided with proof of the existence of the purchasing/borrowing entity to be insured. If a loan is to be insured as part of the transaction contemplated by this Commitment, the Company will require appropriate authority documents for the borrowing entity prior to issuance of any Policy. Once the borrowing entity type is determined please confirm with the Company what authority documents will required.

9. Tennessee law, effective July 1, 2023, prohibits ownership of real property by certain foreign parties. This law can be found at 2023 Tenn. Pub. Ch. 369 (anticipated to be codified at TCA 66-2-301 et seq).  Any loss or damage incurred as a result of a violation of this law is excluded from coverage under the terms of a title insurance policy.

   If a prohibited foreign entity or person is a party to this transaction, the Company must be notified in writing. The Company will not knowingly close or insure a transaction that violates the referenced state law.

10. Payment in full of all past due, or currently due, taxes and assessments.

    Tax Identification No. 133 15 0 145.00: 2024 Davidson County Taxes are Delinquent in the amount of $73,859.00, plus penalties and interest (base amount $65,945.56); 2023 Davidson County Taxes are Delinquent in the amount of $85,729.16, plus penalties and interest (base amount $65,945.56); No City Taxes.

    Tax Identification No. 133 15 0 154.00: 2024 Davidson County Taxes are Delinquent in the amount of $121,485.08, plus penalties and interest (base amount $108,468.84); 2023 Davidson County Taxes are Delinquent in the amount of $141,009.44, plus penalties and interest (base amount $108,468.84); No City Taxes.

    NOTE: 2023 County Taxes became due and payable October 1, 2023, and became Delinquent March 1, 2024.

    NOTE: 2024 County Taxes became due and payable October 1, 2024, and became Delinquent March 1, 2025.

11. Discharge of Assignment of Leases and Rents between JMM II, LLC, LLC, as Assignor, and First Advantage Bank, as Assignee, of record in Instrument No. 201309200099437; as affected by Amendment to Deed of Trust, Assignment of Leases and Security Agreement in Instrument No. 201410270098738, in the Register's Office of Davidson County, Tennessee.

    (Affects Tract 2)

12. Payment, cancellation, and satisfaction of Deed of Trust, Assignment of Leases and Security Agreement executed by JMM II, LLC, a Tennessee limited liability company and JMM III, LLC, a Tennessee limited liability company to Jonathan R. Vinson, Trustee for the benefit of Heritage Bank USA, Inc., a Kentucky State Chartered Commercial Bank, of record in Instrument No. 201510020100643; as affected by Modification Agreement in Instrument No. 201511090113725; Second Modification and Extension Agreement in Instrument No. 201601280008248; and

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*
**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.
**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.


Appointment of Substitute Trustee in Instrument No. 202405230038624, in the Register's Office of Davidson County, Tennessee.

13. Discharge of Assignment of Leases and Rents between JMM II, LLC, a Tennessee limited liability company and JMM III, LLC, a Tennessee limited liability company, as Assignor, and Heritage Bank USA, Inc., a Kentucky State Chartered Commercial Bank, as Assignee, of record in Instrument No. 201510020100644; as affected by First Amended Assignment of Leases and Rents in Instrument No. 201511090113726; and Second Amended Assignment of Leases and Rents in Instrument No. 201601280008249, in the Register's Office of Davidson County, Tennessee.

14. Termination of UCC Financing Statement naming Heritage Bank USA, Inc., as Secured Party, and Cafe Madera, LLC and EI Guitarron, LLC, as Debtor, of record in Instrument No. 201510020100645; as affected by UCC Financing Statement Amendment in Instrument No. 201511090113727; as amended by UCC Financing Statement Amendment in Instrument No. 201601280008250, in the Register's Office of Davidson County, Tennessee.

15. Payment, cancellation, and satisfaction of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Plaza Mariachi, LLC, a Tennessee limited liability company to James E. Spruill, Trustee for the benefit of Mid-City Community Sub-CDE XVIII, LLC, a Maryland limited liability company, of record in Instrument No. 201601280008251; as affected by Release of Deed of Trust in Instrument No. 202410300083217; and Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing in Instrument No. 202410300083219, in the Register's Office of Davidson County, Tennessee.

16. Termination of UCC Financing Statement naming Mid-City Community SUB-CDE XVIII, LLC, as Secured Party, and Plaza Mariachi, LLC, as Debtor, of record in Instrument No. 201601280008253, in the Register's Office of Davidson County, Tennessee.

17. Release of Notice of Lien, of record in Instrument No. 201806110055476, in the Register's Office of Davidson County, Tennessee.

(Affects Tract 2)

18. Release of Notice of Lien, of record in Instrument No. 201807180070169; as affected by Amended Notice of Lien in Instrument No. 201811060110076, in the Register's Office of Davidson County, Tennessee.

19. Release of Notice of Lien, of record in Instrument No. 201909050089920, in the Register's Office of Davidson County, Tennessee.

20. Payment, cancellation, and satisfaction of Deed of Trust executed by Plaza Mariachi, LLC, a Tennessee limited liability company; PM Realty Nashville, LLC, a Tennessee limited liability company; PM Holding Company, LLC, a Tennessee limited liability company; JMM II, LLC, a Tennessee limited liability company; and Mahan Janbakhsh, an individual to Charles W. Cook, III, Trustee for the benefit of Capital One, National Association, of record in Instrument No. 201910210107414, in the Register's Office of Davidson County, Tennessee.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.
**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Form 50129447 (6-14-22)                                                                                                      Page 4 of 12



21. Discharge of Assignment of Leases and Rents between Plaza Mariachi, LLC, a Tennessee limited liability company; PM Realty Nashville, LLC, a Tennessee limited liability company; PM Holding Company, LLC, a Tennessee limited liability company; JMM II, LLC, a Tennessee limited liability company; and Mahan Janbakhsh, an individual, as Assignor, and Capital One, National Association, as Assignee, of record in Instrument No. 201910210107417, in the Register's Office of Davidson County, Tennessee.

22. Release of Judgment Lien, of record in Instrument No. 201911260122276, in the Register's Office of Davidson County, Tennessee.

23. Release of Notice and Abstract of Judgment, of record in Instrument No. 202003300034141, in the Register's Office of Davidson County, Tennessee.

24. Release of Judgment Lien, of record in Instrument No. 202006190064889, in the Register's Office of Davidson County, Tennessee.

25. Release of Notice of State Tax Lien, of record in Instrument No. 202010280124437, in the Register's Office of Davidson County, Tennessee.

26. Release of Civil Warrant, of record in Instrument No. 202405310040593, in the Register's Office of Davidson County, Tennessee.

27. Release of Notice of Federal Tax Lien, of record in Instrument No. 202509020069708, in the Register's Office of Davidson County, Tennessee.

28. Provide documents satisfactory to the Company to review Bankruptcy Case No. 2024-02441, in the United States Bankruptcy Court for the Middle District of Tennessee, including but not limited to an order approving the sale/purchase of the property to be insured. Following a satisfactory order of the Bankruptcy Court, the 14 day appeal period must expire, with no appeal having been filed, before closing the transaction.

29. Execution and delivery to the Company of an Owner's Affidavit, in context to the transaction and in form satisfactory to Company.

30. A Current ALTA/NSPS survey of the Land, certified to the Company, if the Company is expected to delete or modify the general survey exception.

31. Additional requirements may be made for any endorsements to be issued as part of the Policy.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.

**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



Issuing Office File Number: 3941 Nolensville Pike

## SCHEDULE B, PART II—Exceptions

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.**

The Policy will not insure against loss or damage resulting from the terms and conditions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1.     (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.     Any facts, rights, interests or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.     Easements, liens or encumbrances or claims thereof, not shown by the Public Records.

4.     Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.     Any claim to oil, gas, minerals, and all rights incident thereto, previously conveyed, transferred, leased or reserved.

6.     Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I—Requirements are met.

7.     Any lien or right to a lien for services, labor, material or equipment, unless such lien is shown by the Public Records at Date of Policy and not otherwise excepted from coverage herein.

8.     No insurance is afforded as to the acreage or square footage contained in the Land.

9.     Taxes and assessments for the year 2025 and subsequent years, not yet due and payable.

10.    All matters shown on plat(s) of record in Book 4300, Page 6; Book 5200, Page 602; Book 6900, Page 370; Instrument No. 200103160025374; Instrument No. 200304160050965; and Instrument No. 202509250076577, in the Register's Office of Davidson County, Tennessee.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*
**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.
**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.


11.    Clearance Permit of record in Book 1298, Page 488, in the Register's Office of Davidson County, Tennessee.

12.    Perpetual Easement For Highway Purposes from Bonanza Investers Company, a Partnership to State of Tennessee, of record in Book 4046, Page 65, in the Register's Office of Davidson County, Tennessee.

13.    Easement(s) granted The State of Tennessee by Judgment of record in Book 4210, Page 805, in the Register's Office of Davidson County, Tennessee.

14.    This item has been intentionally deleted.

15.    Easement contained in Deed of recorded in Book 6128, Page 961, in the Register's Office of Davidson County, Tennessee.

16.    Terms and provisions of Declaration of Reciprocal Easements and Restrictions, by Michael H. Clark, an individual, of record in Book 6129, Page 163, in the Register's Office of Davidson County, Tennessee.

17.    Easement contained in Deed of recorded in Book 7275, Page 814, in the Register's Office of Davidson County, Tennessee.

18.    Easement contained in Deed of recorded in Book 7275, Page 830, in the Register's Office of Davidson County, Tennessee.

19.    This item has been intentionally deleted.

20.    Terms and provisions of unrecorded lease, as evidenced by Memorandum of Lease by and between Plaza Mariachi, LLC, a Tennessee limited liability company and PM Realty Nashville, LLC, a Tennessee limited liability company, of record in Instrument No. 201601280008252, in the Register's Office of Davidson County, Tennessee.

Note: Upon receipt by the Company of a recorded termination of the above referenced lease, in a form satisfactory to the Company, this exception will not appear in the Policy.

21.    Terms and provisions of Declaration of Easement Agreement, by JMM, LLC, a Tennessee limited liability company in favor of Plaza Mariachi, LLC, a Tennessee limited liability company in favor of, of record in Instrument No. 202104120048022, in the Register's Office of Davidson County, Tennessee.

22.    Rights of parties in possession not shown by the Public Records.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.
**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Case 3:24-bk-... Doc ... Filed 11/05/25 Entered 11/05/25 17:12:07 Desc Main
Document Page 84 of 103



Issuing Office File Number: 3941 Nolensville Pike

## EXHIBIT A

The Land referred to herein below in situated in the County of Davidson, State of Tennessee, and described as follows:

Being Lots 1, 2 and 3, MAJOR SUBDIVISION OF THE REVISION PLAT OF ELYSIAN PLAZA LOTS 4 & 5, as shown in Instrument No. 202509250076577, in the register's office of Davidoson County, Tennessee, to which plat reference is made for a more detailed description.

Being the same property conveyed to Plaza Mariachi, LLC, a Tennessee limited liability company by Deed from JMM III, LLC, a Tennessee limited liability company of record in Instrument No. 201601280008247 in the Register's Office of Davidson County, Tennessee.

Being the same property conveyed to Plaza Mariachi, LLC, a Tennessee limited liability company by Deed from JMM II, LLC, a Tennessee limited liability company of record in Instrument No. 201601280008246 in the Register's Office of Davidson County, Tennessee.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.
**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Form 50129447 (6-14-22)    Page 8 of 12


**ALTA COMMITMENT FOR TITLE INSURANCE**
**issued by**
**FIRST AMERICAN TITLE INSURANCE COMPANY**

## NOTICE

**IMPORTANT—READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

## COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and the Commitment Conditions, First American Title Insurance Company, a Nebraska Corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

If all of the Schedule B, Part I—Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**FIRST AMERICAN TITLE INSURANCE COMPANY**

Sally F. Tyler, President

Lisa W. Cornehl, Secretary

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.

**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Form 50129447 (6-14-22)


## COMMITMENT CONDITIONS

1. **DEFINITIONS**
   a. "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.
   b. "Knowledge" or "Known": Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.
   c. "Land": The land described in Item 5 of Schedule A and improvements located on that land that by State law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   d. "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.
   e. "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   f. "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.
   g. "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   h. "Public Records": The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.
   i. "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.
   j. "Title": The estate or interest in the Land identified in Item 3 of Schedule A.

2. If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   a. the Notice;
   b. the Commitment to Issue Policy;
   c. the Commitment Conditions;
   d. Schedule A;
   e. Schedule B, Part I—Requirements; and
   f. Schedule B, Part II—Exceptions; and
   g. a counter-signature by the Company or its issuing agent that may be in electronic form.

4. **COMPANY'S RIGHT TO AMEND**
   The Company may amend this Commitment at any time. If the Company amends this Commitment

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.

**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Form 50129447 (6-14-22)


to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.

**5.** LIMITATIONS OF LIABILITY
    a.    The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
        i.    comply with the Schedule B, Part I—Requirements;
        ii.    eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or
        iii.    acquire the Title or create the Mortgage covered by this Commitment.
    b.    The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
    c.    The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
    d.    The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.
    e.    The Company is not liable for the content of the Transaction Identification Data, if any.
    f.    The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
    g.    The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.

**6.** LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT; CHOICE OF LAW AND CHOICE OF FORUM
    a.    Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
    b.    Any claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment. Any litigation or other proceeding brought by the Proposed Insured against the Company must be filed only in a State or federal court having jurisdiction.
    c.    This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.
    d.    The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.
    e.    Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.
    f.    When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7.** IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for closing, settlement,

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.
**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.
Form 50129447 (6-14-22)



escrow, or any other purpose.

**8.**   PRO-FORMA POLICY

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9.**   CLAIMS PROCEDURES

This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. Commitment Condition 9 does not modify the limitations of liability in Commitment Conditions 5 and 6.

**10.**   CLASS ACTION

ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

**11.**   ARBITRATION

The Policy contains an arbitration clause. All arbitrable matters when the Proposed Amount of Insurance is $2,000,000 or less may be arbitrated at the election of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by First American Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**\* Copyright 2025 First American Financial Corporation. All rights reserved.**
All information, data, and material created or compiled by or on behalf of First American Financial Corporation is restricted and may not be copied or used for derivative products/services without the prior express written permission of First American Financial Corporation.
**\*\* Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Form 50129447 (6-14-22)                                                                    Page 12 of 12

# **EXHIBIT E**

## **ESTIMATED WATERFALL**

Debtor's Estimated Waterfall

| | | Assumes Sale date 12/10/2025 | |
|---|---|---|---|
| Purchase Price | $ | 13,450,000.00 | |
| Tenant Security Deposits | $ | - | |
| Seller's Broker Commission @ 1.49% | $ | 200,000.00 | *$45,000 PM Realty Obligation* |
| Title and Escrow | $ | 20,000.00 | |
| 2023-2025 Property Taxes 3955 Nolensville Pike | $ | 357,213.62 | *2025 estimated/Prorated through Closing* |
| 2023 - 2025 Property Taxes 3941 Nolensville Pike | $ | 217,155.34 | *2025 estimated/Prorated through Closing* |
| **Net Available to Secured Creditors** | $ | 12,655,631.05 | |
| First Financial Bank Loan 1295 Payoff | $ | 6,991,700.89 | *Assumes adequate protection payments continue through 11/2025* |
| First Financial Bank Loan 1400 Payoff | $ | 560,203.29 | *Assumes guarantor payments continue through 11/2025* |
| Mechanic's Liens (Approx.) | $ | 73,901.81 | |
| Capital One Claim | $ | 4,894,786.75 | *CapOne confirmed balance* |
| **Sale Surplus/(Deficit)** | $ | 135,038.30 | |
| | | | |
| Estimated DIP Account Cash | $ | 60,000.00 | |
| **Available to Pay Unsecured Claims** | $ | 195,038.30 | |
| Estimated Unpaid Professional Fees | $ | 171,425.00 | |
| Estimated Priority Tax Claims | $ | 11,332.68 | |
| Estimated Unsecured Non-Priority Tax | $ | 5,830.71 | |
| Tenn. Dept. Environment and Conservation | | | *Covered by State Dry Cleaner Fund Payments* |
| **Claim Surplus** | $ | 6,449.91 | |

# **EXHIBIT F**

## **BROKER DECLARATION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Plaza Mariachi, LLC, | Case No. 3:24-bk-02441 |
| | Judge Hon. Charles M. Walker |
| Debtor. | **DECLARATION OF JIM MORRIS OF COLLIERS INTERNATIONAL** |

I, JIM MORRIS, hereby declare as follows under penalty of perjury under the laws of the United States of America:

1.     I a Senior Vice President of Colliers International Nashville, LLC ("Colliers") with an office located at 615 3rd Avenue South, Suite 500, Nashville, TN 37210.

2.     I make this Declaration based on my personal knowledge and review of the records maintained by Colliers in the ordinary course of its business. If called as a witness, I could and would competently testify to the matters set forth herein.

3.     By Order [Dkt. 54] dated August 12, 2024 (the "Broker Approval Order"), the Court approved the Plaza Mariachi, LLC's (the "Debtor") retention of Colliers as its real estate broker in the case.

4.     I am the person at Colliers who had primary responsibility for the engagement.

5.     Colliers began marketing the retail shops around the Plaza Mariachi anchor space for sale during the summer of 2024. Our platform is set up to specifically target

1

buyers of retail centers throughout the US. Hundreds of prospects viewed the offering but many hesitated to pursue the opportunity due to the unique entertainment operations within the Plaza Mariachi anchor space. Most buyers are comfortable owning a center next to a national brand such as Walmart, Kroger, Target, Publix - so it was hard to convince prospects about the long-term viability of the anchor space which has a major influence on the value and operations of the shops.

6. It was also difficult to get prospects comfortable with the anchor space viability due to the owner's federal indictment and his ultimate conviction. This detail was the primary reason there were a limited number of legitimate prospects.

7. The Debtor agreed to terms with a local buyer during the early fall of 2024. Unfortunately, this prospect was not very experienced with multi-million dollar shopping center acquisitions and we were never able to get into a sale contract.

8. We moved on from the first major prospect and began to fully market the center again to a national audience. The same issues made it hard to find quality prospects - but we did find a prospect out of New Jersey who finally got comfortable during the spring of 2025. The Debtor contracted with that group and we started a due diligence period. During that time, some leftover environmental issues from a previous dry cleaners came up as well as some new property line changes that ultimately lead the buyer to terminate the contract and state that he had no further interest.

9. During the summer of 2025, we found Highland Capital Investments, LLC who immediately became a serious prospect. This group is based in Nashville and just

2

happened to fully understand Plaza Mariachi, how it operated, and what it means to the community.

10.     During the negotiations of a contract for the retail shops, Mark Janbakhsh, the Debtor's principal was convicted. After the conviction, the Debtor requested that we check with Highland Capital to see if they would also include the Plaza Mariachi anchor space in a sale-leaseback structure so PM Realty Nashville, LLC could continue to operate for many years through a lease, while allowing the Debtor to generate sufficient proceeds to pay all creditors in full and resolve the bankruptcy case.

11.     On or about September 8, 2025, the Debtor executed a Purchase Agreement with Highland Capital Investments, LLC, concerning the proposed purchase of the real property commonly known as Plaza Mariachi and The Shops at Plaza Mariachi (as more particularly described in the Purchase Agreement, the "Property"). The Purchase Agreement provided for a total purchase price of $14,250,000 and an initial Inspection Period scheduled to expire on October 23, 2025. As part of the contemplated transaction, the Buyer will enter into a post-closing lease of the Plaza Mariachi anchor space to PM Realty Nashville, LLC.

12.     On October 16, 2025, the Debtor and Highland Capital Investments, LLC executed a First Amendment to Agreement of Purchase and Sale (the "First Amendment"), which added a Rent Reserve Provision providing an $800,000 credit to Purchaser at closing, with corresponding rent credits under a future master lease, as more fully set forth in the First Amendment.

3

13.     On October 21, 2025, the Debtor and Highland Capital Investments, LLC executed a Second Amendment to Agreement of Purchase and Sale extending the Inspection Period to November 6, 2025.

14.     On October 26, 2025, Highland Capital Investments, LLC assigned all of its rights and obligations under the Purchase Agreement (as amended) to HC Plaza, LLC, a Tennessee limited liability company ("Buyer"). Following that assignment, Buyer became the sole purchaser under the Purchase Agreement.

15.     On November 4, 2025, the Debtor and Buyer executed a Third Amendment to Agreement of Purchase and Sale, which (a) deleted the Rent Reserve Provision, (b) reduced the Purchase Price from $14,250,000 to $13,450,000, and (c) waived Buyer's right to terminate the Purchase Agreement during the Inspection Period.

16.     The Purchase Agreement was negotiated at arm's length and in good faith. The Buyer and its representatives had no prior connection, affiliation, or relationship of any kind with the Debtor, its principal Mark Janbakhsh, or any affiliate of the Debtor. All negotiations were conducted through separate counsel and professional advisors, and the terms were the product of independent business judgment and bargaining. Buyer negotiated the Purchase Agreement and each amendment at arm's length, relying on its own independent judgment and due diligence, and the transaction reflects the highest and best offer for the Property obtained through a fair and open process.

17.     I believe that the purchase price being paid by the Buyer under the Purchase Agreement is fair and reasonable under the circumstances, and represents the highest and best price available for the Debtor's Property.

4

18.     I believe that a private sale of the Property to the Buyer is appropriate under the circumstances. Colliers marketed the Property exhaustively both before and after the bankruptcy filing. The Property has unique characteristics that have made a sale particularly challenging. And, the circumstances surrounding the recent conviction of the Debtor's principal all combine to create a dynamic necessitating a private sale. Requiring further marketing or an auction likely will result in the loss of the sale, risking a full recovery to all creditors.

19.     We are now at the point where Highland Capital has completed due diligence and is ready to close on the acquisition. Time is of the essence due to the many complicated aspects of this sale. Therefore, I believe the Court's waiver of any stay of the sale order is necessary and appropriate to preserve this sale.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of November, 2025.


By:_____
        *Jim Morris*
        Jim Morris
        Senior Vice President
        Colliers International Nashville, LLC

5

# PM Broker Declaration

**Final Audit Report**                                    2025-11-05

| | |
|---|---|
| Created: | 2025-11-05 |
| By: | Todd Burgess (todd@theburgesslawgroup.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAACDcYKCdKaITsE4-op_ziH-clk_TVm7kS |

## "PM Broker Declaration" History

📄 Document created by Todd Burgess (todd@theburgesslawgroup.com)
2025-11-05 - 7:52:04 PM GMT

📧 Document emailed to jim.morris@colliers.com for signature
2025-11-05 - 7:52:29 PM GMT

📄 Email viewed by jim.morris@colliers.com
2025-11-05 - 8:00:03 PM GMT

✍️ Signer jim.morris@colliers.com entered name at signing as Jim Morris
2025-11-05 - 8:00:54 PM GMT

✍️ Document e-signed by Jim Morris (jim.morris@colliers.com)
Signature Date: 2025-11-05 - 8:00:56 PM GMT - Time Source: server

✅ Agreement completed.
2025-11-05 - 8:00:56 PM GMT

 **Adobe Acrobat Sign**

**EXHIBIT G**

**BUYER DECLARATION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Plaza Mariachi, LLC, | Case No. 3:24-bk-02441 |
| | Judge Hon. Charles M. Walker |
| Debtor. | **DECLARATION OF WYATT WOELTJE IN SUPPORT OF DEBTOR'S MOTION FOR ORDER APPROVING SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS** |

I, WYATT WOELTJE, hereby declare as follows under penalty of perjury under the laws of the United States of America:

1.     I am the Principal of Highland Capital Investments, LLC and the Manager of its assignee HC Plaza, LLC, a Tennessee limited liability company ("Buyer"). I make this Declaration based on my personal knowledge and review of the records maintained in the ordinary course of Buyer's business.  If called as a witness, I could and would competently testify to the matters set forth herein.

2.     On or about September 8, 2025, Plaza Mariachi, LLC (the "Debtor") executed a Purchase Agreement with Highland Capital Investments, LLC, concerning the proposed purchase of the real property commonly known as Plaza Mariachi and The Shops at Plaza Mariachi (as more particularly described in the Purchase Agreement, the "Property"). The Purchase Agreement provided for a total purchase price of $14,250,000 and an initial Inspection Period scheduled to expire on October 23, 2025. As part of the

1

contemplated transaction, the Buyer will enter into a post-closing lease of the Plaza Mariachi anchor space to Plaza Mariachi Ventures, LLC.

3. The Purchase Agreement was negotiated at arm's length and in good faith. The Buyer and its representatives had no prior connection, affiliation, or relationship of any kind with the Debtor, its principal Mark Janbakhsh, or any affiliate of the Debtor. All negotiations were conducted through separate counsel and professional advisors, and the terms were the product of independent business judgment and bargaining.

4. On October 16, 2025, the Debtor and Highland Capital Investments, LLC executed a First Amendment to Agreement of Purchase and Sale (the "First Amendment"), which added a Rent Reserve Provision providing an $800,000 credit to Purchaser at closing, with corresponding rent credits under a future master lease, as more fully set forth in the First Amendment.

5. On October 21, 2025, the Debtor and Highland Capital Investments, LLC executed a Second Amendment to Agreement of Purchase and Sale extending the Inspection Period to November 6, 2025.

6. On October 26, 2025, Highland Capital Investments, LLC assigned all of its rights and obligations under the Purchase Agreement (as amended) to Buyer (the "Assignment"). Following that assignment, Buyer became the sole purchaser under the Purchase Agreement.

7. On November 4, 2025, the Debtor and Buyer executed a Third Amendment to Agreement of Purchase and Sale, which (a) deleted the Rent Reserve Provision, (b) reduced the Purchase Price from $14,250,000 to $13,450,000, and (c) waived Buyer's right

2

to terminate the Purchase Agreement during the Inspection Period.

8. Based on the Purchase Agreement, as amended, Buyer is ready, willing, and able to close the purchase of the Property promptly upon entry of an order of the United States Bankruptcy Court for the Middle District of Tennessee approving the sale free and clear of all liens, claims, and interests, in accordance with the terms of the Purchase Agreement, as amended.

9. Buyer has acted in good faith within the meaning of 11 U.S.C. § 363(m). Buyer has not engaged in any fraud, collusion, or conduct designed to take unfair advantage of any party in interest. Buyer has not agreed to share or split any consideration with the Debtor, its insiders, or any other bidder, and no party has been promised any benefit outside the terms of the Purchase Agreement.

10. Buyer negotiated the Purchase Agreement and each amendment at arm's length, relying on its own independent judgment and due diligence, and the transaction reflects the highest and best offer for the Property obtained through a fair and open process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of November, 2025.

HC PLAZA, LLC, a Tennessee limited liability company

By: _Wyatt Woeltje_____
Name: Wyatt Woeltje
Its: Manager

3

# PM Buyer Declaration

Final Audit Report                                                    2025-11-05

| | |
|---|---|
| Created: | 2025-11-05 |
| By: | Todd Burgess (todd@theburgesslawgroup.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAkNoOt_bDJVQQ5_GEM9dY8isPGcnsp8GK |

## "PM Buyer Declaration" History

📄 Document created by Todd Burgess (todd@theburgesslawgroup.com)
2025-11-05 - 7:49:27 PM GMT

📧 Document emailed to Wyatt Woeltje (wyatt@highlandcpt.com) for signature
2025-11-05 - 7:49:45 PM GMT

📄 Email viewed by Wyatt Woeltje (wyatt@highlandcpt.com)
2025-11-05 - 8:30:00 PM GMT

✍️ Document e-signed by Wyatt Woeltje (wyatt@highlandcpt.com)
Signature Date: 2025-11-05 - 8:31:55 PM GMT - Time Source: server

✅ Agreement completed.
2025-11-05 - 8:31:55 PM GMT

 Adobe Acrobat Sign