# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| In re:<br><br>Plaza Mariachi, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 3:24-bk-02441<br><br>Judge Hon. Charles M. Walker |

### SUPPLEMENTAL BRIEF IN OPPOSITION TO
### DEBTOR'S MOTION FOR DETERMINATION OF SECURED CLAIM OF FIRST FINANCIAL BANK, N.A.

NOW COMES Creditor and party-in-interest, First Financial Bank, N. A. ("FFB"), by and through undersigned counsel, and files this supplemental brief (the "Supplemental Brief") in connection with the *Motion to Approve: (1) Sale of Real Property Free and Clear of Liens, Claims, and Interests; (II) Approval of Payment of Commission to Real Estate Broker; and (III) Related Relief* [Docket No. 158] (the "Sale Motion")[1] filed by the Debtor Plaza Mariachi, LLC ("Plaza Mariachi" or the "Debtor") and in response to the (A) Debtor's *Reply in Further Support of Motion to Approve Sale of Real Property; Notice of Revised Sale Waterfall and Capital One Agreement; And Objection to And Request for Determination of Amount of First Financial Bank, N. A.'s Claim* [Docket No. 163] (the "Reply") and (B) *Capital One's Statement of Position Regarding Debtor's Sale Motion* [Docket No. 164] (the "Capital One Statement") filed by Capital One, N.A. ("Capital

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion and/or Reply, as applicable.

One". Specifically, this Supplemental Brief is intended to respond to the arguments of the Debtor and Capital One with regard to the calculation of FFB's post-petition interest and attorneys' fees.[2]

**Introduction**

1.  In the name of equity, the Debtor (and junior lienholder Capital One) have asked this Court to modify the contractually agreed upon terms of the lending relationship entered into between Plaza Mariachi, as borrower, and Heritage Bank USA, Inc., predecessor-in-interest to FFB, dating back to 2015. In order to primarily benefit Capital One, the Debtor has asked this Court to improve upon the terms entered into between the Debtor and FFB in a lending environment that was much more favorable than is currently. The Debtor asks this Court to impose an interest rate upon FFB that is better than the prime rate that was available at either the time this case was filed, or the prime rate that was available at the time the Sale Motion was filed.[3]

2.  In considering the equities, it should be remembered that Capital One's junior lien arises solely out of fraud committed by or at the direction of Mahan Janbakhsh (a/k/a Mark Janbakhsh) ("Mark Janbakhsh"), the owner and operator of Plaza Mariachi, in connection with bankruptcy cases filed by Auto Masters, LLC and various affiliates owned and/or controlled by Mark Janbakhsh (the "Auto Masters Bankruptcy Cases"). Capital One's claim resulted from the tortious acts of others and was resolved through a settlement agreement with Capital One reached in the Auto Master Bankruptcy Cases. FFB was not a party to this settlement agreement and had no seat at the table when it was being negotiated and executed. Moreover, Capital One did not lend money to the Debtor (Plaza Mariachi), as FFB did, in reliance upon the value of the real

---

[2] As argued in greater detail in Section III of this Supplemental Brief *infra*, FFB respectfully submits that its attorneys' fees can be addressed under the same schedule as the fees for the estate's professionals.

[3] The Court may take judicial notice of the fact that prime was 8.50% on July 1, 2024, and was 7.00% as of the date the Sale Motion was filed.

property owned by Plaza Mariachi. In addition, as demonstrated by the settlement agreement attached to the Capital One Statement, Capital One has many sources of recovery in addition to the distribution that it expects to receive at the closing of the proposed sale.[4]

3. Section 506(b) of the Bankruptcy Code allows oversecured creditors to recover post-petition interest and reasonable attorneys' fees in connection with their claims. In *Ron Pair Enterprises, Inc.*, the Supreme Court held oversecured creditors' claims for post-petition interest is "unqualified." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989). However, the Court did not set a presumptive rate for post-petition interest.

4. Following *Ron Pair*, the majority of courts have found that post-petition interest should be computed at the contract rate of interest. COLLIER ON BANKRUPTCY ¶ 506.04[2][b] (Richard Levin & Henry J. Sommer eds., 16th ed. 2024). Section 506(b) does not authorize special bankruptcy interest rates, or prescribe standards for determining an appropriate rate. *Id*. Many courts have held the contract rate is presumed to be the applicable rate, but that the Debtor may override the presumption on the basis of equitable principles.

5. There are several well-known maxims of equity that are at play in this case: "one who seeks equity must do equity," "equity aids the vigilant", and those "who come into equity must come with clean hands." The application of these principles does not favor either the Debtor or Capital One. As demonstrated in Part III of this Supplemental Brief, convicted felon Mark Janbakhsh, had been directing this case for his own economic self-interest and violating his fiduciary obligations to the estate and its creditors. Mark Janbakhsh held back the marketing and sale of the entirety of the real property owned by Plaza Mariachi and only seriously considered

---

[4] In addition to the collateral of Plaza Mariachi, Capital One has liens on intellectual property, real property and personal property owned by non-debtor affiliates of Plaza Mariachi. As such, Capital One's prospects of being made whole are substantially greater than FFB's.

that option until after a jury recently returned a unanimous verdict on 17 out of 18 federal felony counts. For whatever reason, Capital One stood back and accepted this course of conduct, allowing the post-petition interest of a senior lienholder to continue to accrue.

6. The Debtor has the burden of proof to rebut the presumption that the contract default rate should apply. Absent a showing that (1) the default rate is punitive rather than compensatory; (2) the rate is unconscionable or violates state law; (3) the rate was the product of unequal bargaining power or unfair dealing; or (4) the creditor engaged in any inequitable conduct default rate is punitive, unconscionable or otherwise unenforceable. In the absence of ***admissible evidence*** on these points, the agreed default rate of interest should apply and the Court should not exercise its equitable powers to reduce it.

7. The Debtor has not and cannot demonstrate that any of the above factors apply with respect to FFB or to the applicable contractual default rates. Moreover, the default rates under the two notes at issue are very near the current prime interest rate: 10.25% and 9.75%--2.75% and 2.25% above the current prime interest rate, respectively.[5] As discussed in greater detail in Part II.C. of this Supplemental Brief, *infra*, the Debtor's reliance on the unpublished decision in *Perkins* is misplaced. Moreover, as shown in Part IV, *infra*, FFB has not waived its right to seek post-petition interest calculated, and accepted by the Debtor and Capital One, at these rates and a correct contractual interpretation of the forbearance agreements supports the conclusion that the parties intended the 12.00% interest to continue to apply to the admittedly defaulted loan obligations. Indeed, accrued prepetition interest had been calculated at the 12.00% forbearance interest rate.

8. As stated at the Initial Sale Hearing, FFB continues to support the sale of the property. Unlike Capital One, FFB supported the immediate entry of an order approving the sale

---

[5] This only applies if the Court concludes that the parties did not intend that the 12.00% in the forbearance agreements would continue beyond the termination date of the forbearance period.

of the property on December 3, 2025. Rather than deferring these issues to a later date, the Debtor and Capital One continue to hold the sale hostage to secure concessions from FFB. As set forth in Part I of this Supplemental Brief, *infra*, FFB is willing to accept a reduced distribution from sale proceeds to allow the sale to close and to bridge the gap in the waterfall. Further, FFB consents to the reduced allowance of its total claim, with the resulting deficiency to be treated as a general unsecured claim against the estate. This proposal strikes the appropriate balance between funding allowed priority claims while preserving FFB's ability to collect from other sources. Simply put, there is no equitable reason to wipe out FFB's deficiency claim as requested by the Debtor. Since FFB is amenable to the deficiency claim being treated as a general unsecured claim, there is no compelling reason to rush to a determination of the reasonableness of FFB's attorneys' fees prior to closing.

**Statement of Facts and Procedural History**

9. The Property was purchased by the Debtor in 2015. In connection with that purchase, the Debtor and Heritage Bank USA, Inc., predecessor-in-interest to FFB, entered into two loan transactions with the Debtor: Loan No. 1295 and Loan No. 1400 (together, the "Loans").

10. As early as March 14, 2020, the Debtor and various non-debtor obligors were in default under the Loan Documents and acknowledged the existence of the defaults and their inability to pay the indebtedness owed at the time of the defaults in full. (*See* Forbearance Agreement dated March 14, 2023, at 2, Ex. H to Claim 8-1, & Forbearance Agreement dated March 14, 2023, at 2, Ex. I to Claim 8-1.) The parties to the original forbearance agreements agreed that, as of March 14, 2020, the total indebtedness owed was $7,127,299.15 for Loan 1295, and $965,573.16 for Loan 1400. (*See* Forbearance Agreement dated March 14, 2023, ¶ 7 at 3, Ex. H to Claim 8-1, & Forbearance Agreement dated March 14, 2023, ¶ 7 at 3, Ex. I to Claim 8-1.)

11. The forbearance agreements were amended and extended seven times, with the final amendment being entered into on January 12, 2024. (Seventh Amendment to Forbearance Agreement dated January 12, 2024, Ex. H to Claim 8-1 & Seventh Amendment to Forbearance Agreement dated January 12, 2024, Ex. I to Claim 8-1.) The Parties to the Seventh Amendment to Forbearance Agreement agreed that, as of January 9, 2024, the total indebtedness owed was $7,278,897.38 for Loan 1295, and $936,673.05 for Loan 1400. (Seventh Amendment to Forbearance Agreement dated January 12, 2024, Ex. H to Claim 8-1 & Seventh Amendment to Forbearance Agreement dated January 12, 2024, ¶4, Ex. I to Claim 8-1.)

12. The Debtor filed a Chapter 11 Voluntary Petition for Bankruptcy in the United States Bankruptcy Court for the Middle District of Tennessee on July 1, 2024 (the "Petition Date").

13. As of the Petition Date, the Debtor's total obligations to FFB with respect to the Loans totaled Eight Million Two Hundred and Three Thousand Six Hundred Thirty-Nine and 37/100 Dollars ($8,203,639.37) (the "Prepetition Indebtedness"). (*See* Claim 8-1.) The Prepetition Indebtedness does not include any interest, late charges, costs and fees, including, without limitation, attorneys' fees and expenses that have accrued, and continue to accrue, since the Petition Date.

14. On November 5, 2025, the Debtor filed the Sale Motion.

15. On November 26, 2025, FFB filed the *Limited Objection and Reservation of Rights of First Financial Bank to Debtor's Motion to Approve: (I) Sale of Real Property Free and Clear of Liens, Claims and Interests; (II) Approval of payment of Commission to Real Estate Broker; and (III) Related Relief* [Docket No. 161].

16. On December 1, 2025, the Debtor filed the Reply and Capital One filed the Capital One Statement. Both the Reply and the Capital One Statement were filed *less than 48 hours* before

the hearing scheduled and held on December 3, 2025 (the "Initial Sale Hearing") to consider the relief requested in the Sale Motion. As FFB argued at the Initial Sale Hearing, both the Reply and the Capital One Statement requested a determination of the extent of FFB's allowed claim pursuant to Section 506(b), relief which was outside of what was requested in the Sale Motion and which was raised in a procedurally defective manner for the first time in a reply brief.

17. To afford FFB a reasonable opportunity to address the issues that were raised for the first time in the Reply and the Capital One Statement (and to cleanse the obvious Constitutional Due Process issues created by the Debtor and Capital One), the Court entertained supplemental briefing, with FFB to file its supplemental brief on or before December 9, 2025. This Supplemental Brief is timely filed.

**Argument**

I. **FFB SHOULD NOT RECEIVE LESS THAN $7,792,916.36 AS A DISTRIBUTION FROM THE SALE OF THE REAL PROPERTY.**

18. The "not that unique" facts and circumstances of this case do not justify imposing a below-market interest rate upon FFB. Unlike junior secured creditor, Capital One, FFB loaned money to the Debtor in ***this case***, against the value of the assets that are to be sold pursuant to the Sale Motion. Nevertheless, FFB is willing to accept a reduced distribution from sale proceeds and treatment of its claim (collectively, the "FFB Proposal"), as follows:

    a. FFB is willing to accept a total allowed claim in the amount of $8,320,318.57 (the "FFB Allowed Claim"). The FFB Allowed Claim would be allocated and calculated as follows:

- Loan 1295: $7,580,044.67[6]

---

[6] This amount includes post-petition interest calculated at the applicable note default rate and includes estimated attorneys' fees. To the extent that the Debtor and Capital One do not agree to the FFB Proposal, FFB maintains that it is entitled to its contractual forbearance interest rate of 12% on Loan 1295 and Loan 1400, resulting in a total claim of $8,505,341.65.

7

- Loan 1400: $ 740,273.90[7]

b. FFB is willing to accept a distribution from the sale proceeds in the total amount of $7,792,916.36 (the "FFB Sale Distribution"), leaving an unpaid deficiency on the FFB Allowed Claim of $527,402.21 (the "FFB Deficiency").

c. The FFB Deficiency would be treated as a general unsecured claim against the Debtor's estate, and as an amount owed by the various non-debtor obligors, collectible outside of this bankruptcy case.

19. In the event that an agreement is not reached prior to the hearing currently set for December 17, 2025, at 2:00 p.m. (CT), the Court should enter an Order (A) allowing FFB's secured claim pursuant to the legal authority and argument discussed in greater detail below, in an amount equal to or greater than the FFB Allowed Claim and (B) approving the immediate payment of the FFB Sale Distribution from the sale proceeds.

## II. SECTION 506(b) PROVIDES AN UNQUALIFIED RIGHT TO POST-PETITION INTEREST.

20. Section 506(b) of the Bankruptcy Code allows oversecured creditors to recover post-petition interest and reasonable attorney fees on their claims. 11 U.S.C. § 506(b). In *United States v. Ron Pair Enterprises, Inc.*, the Supreme Court held that an oversecured creditor's entitlement to post-petition interest is "unqualified." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989).

### A. THE MAJORITY RULE APPLIES THE CONTRACT DEFAULT RATE ABSENT PUNITIVE OR UNENFORCEABLE TERMS

21. Following *Ron Pair*, courts have held that post-petition interest should be computed at the contract rate of interest, including contract default rates. While the Sixth Circuit Court of Appeals has not weighed in on the issue, a majority of circuits have ruled that there is a presumption favoring the contractual default rate, with the court having the ability to change the

---

[7] This amount includes post-petition interest calculated at the negotiated forbearance rate and includes estimated attorneys' fees.

interest rate where it is found to be an unenforceable penalty, or where the equities of the case do not support the contract default rate. *See In re SW Boston Hotel Venture, LLC*, 748 F.3d 393, 403 (1st Cir. 2014) (holding that absent a showing that the default rate is punitive, the contract default rate applies to post-petition interest); *In re Southland Corp.*, 160 F.3d 1054, 1058 (5th Cir. 1998) (concluding that the contract rate, including default provisions, governs post-petition interest under Section 506(b)); *see also In re Beltway One Development Group*, 547 B.R. 819, 825 (B.A.P. 9th Cir. 2016) (applying contract default rate where debtor failed to demonstrate rate was unenforceable under state law). The Eighth Circuit BAP has gone even further, finding that Section 506(b) does not authorize courts to modify contractual interest rates at all, even under consideration of equitable factors. *See In re Family Pharmacy, Inc.*, 614 B.R. 58, 66 (B.A.P. 8th Cir. 2020) ("Simply put, no section of the Bankruptcy Code gives the bankruptcy court authority, equitable or otherwise, to modify a contractual interest rate prior to plan confirmation.").

### B. THE DEBTOR BEARS THE BURDEN OF REBUTTING THE PRESUMPTION THAT THE CONTRACT RATE APPLIES

22. The default interest rates at issue here are both commercially reasonable and serve the legitimate compensatory purpose of protecting the creditor from the actual costs and risks associated with default. Default rates compensate lenders for increased administrative costs, collection efforts, loss of liquidity, and the heightened credit risk that accompanies a borrower's breach. *See In re Southland Corp.*, 160 F.3d at 1058 (recognizing that default rates reflect "the increased cost and risk to the lender occasioned by the borrower's default").

23. The Debtor voluntarily negotiated and agreed to this contract default rate in exchange for access to credit on favorable terms. The default rate was a material component of the parties' bargain, expressly disclosed in the loan documents, and reflected the parties' allocation of default risk at the time of contracting. Absent a showing that the default rate is punitive,

9

Case 3:24-bk-02441   Doc 169   Filed 12/09/25   Entered 12/09/25 21:33:19   Desc Main
Document      Page 9 of 19

unconscionable, or otherwise unenforceable under applicable state law, this Court should respect the parties' contractual allocation of risk. *See In re SW Boston Hotel Venture*, 748 F.3d at 403; *In re Beltway One Development Group*, 547 B.R. at 826.

24. The burden of proof rests on the Debtor to demonstrate that the contract default rate should not apply. *In re SW Boston Hotel Venture,* 748 F.3d at 403 (creditor "entitled to the default rate of interest provided by the contract" unless debtor proves rate is unenforceable or punitive); *In re Beltway One Development Group,* 547 B.R. at 826 (debtor "failed to meet its burden" of showing default rate was unenforceable). The contract rate is the presumptive rule; departure from that rate is the exception requiring affirmative proof.

### C. THE EQUITY PRINCIPLES ARTICULATED IN *PERKINS* ARE NOT PERSUASIVE AND DO NOT WARRANT DEVIATION FROM THE CONTRACT DEFAULT RATE IN THE PRESENT CASE

25. Here, the Debtor has not met its burden to overcome the presumption for the contract default rate. The single, unreported case cited by the Debtor, *In re Perkins*, 2017 WL 439319 (Bankr. W.D. Ky. 2017), misallocates this burden of proof and suffers from two flaws in reasoning that make it unpersuasive:

26. First, the analysis in *Perkins* confuses "oversecured status" with "lack of risk." The fact that a creditor is oversecured at a particular moment in time does not eliminate the creditor's risk or render post-petition interest a "windfall." Collateral values fluctuate, bankruptcy cases extend for months or years, administrative expenses accrue, and statutory liens may prime the creditor's position. Several of these circumstances have come to pass here and remain a risk if the proposed sale does not close. FFB remains exposed to diminution in collateral value, depreciation, and market volatility during the pendency of the case. Default rates compensate for these ongoing risks, not merely for the risk of ultimate non-payment.

27. Debtor relies on *Perkins* when it states in the Reply that FFB "has had 0% risk of non-payment from the moment the Debtor's case was filed" as a reason to deny the "windfall" that FFB is seeking. (Reply at 2, n.2). Debtor's suggestion that oversecured status alone defeats entitlement to the contract default rate would effectively write the second clause of Section 506(b) out of the statute.

28. Second, the concern about "eviscerating" payments to unsecured creditors is not a valid basis for denying a secured creditor's statutory entitlement under Section 506(b). Congress established a priority scheme in the Bankruptcy Code that places secured creditors ahead of unsecured creditors. Section 506(b) explicitly provides that oversecured creditors recover interest, fees, and costs before any distribution to unsecured creditors. The policy choice has already been made by Congress. Bankruptcy courts cannot use equity to reallocate the statutory priority scheme simply because the result may leave less for unsecured creditors. *In re SW Bos. Hotel Venture, LLC*, 748 F.3d 393, 413 (1st Cir. 2014) (citing *In re Lapiana,* 909 F.2d 221, 223 (7th Cir.1990) ("[B]ankruptcy, despite its equity pedigree, is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy....")).

29. If the court's reasoning in *Perkins* is accepted, no oversecured creditor could ever recover its contract default rate because doing so would always reduce the funds available to junior creditors. Such an outcome would nullify Section 506(b).

30. The Debtor has not presented and cannot produce any evidence that: (1) the default rate is punitive rather than compensatory; (2) the rate is unconscionable or violates state law; (3) the rate was the product of unequal bargaining power or unfair dealing; or (4) the creditor engaged in any inequitable conduct justifying the exercise of equitable powers.

31. In the absence of such a showing, fundamental principles of contract law, bankruptcy policy, and respect for the parties' bargain compel enforcement of the agreed-upon default rate. The Debtor cannot meet its burden by simply arguing that application of the non-default contract rate would benefit other creditors.

32. Following *Ron Pair*, the vast majority of courts have found that postpetition interest should be computed at the contract default rate of interest, with varying levels of court discretion where required by state law or equity principles. Here, the court must first (1) recognize the presumption favoring the contractual default rate, and (2) evaluate whether the Debtor presented sufficient evidence to rebut that presumption, before determining there is a basis for equitable denial of the contract default rate. The Debtor has not successfully rebutted the presumption, and the equity principles argued are not persuasive. Accordingly, the court should respect the parties' contractual allocation of risk and approve the contractual forbearance interest rate for purposes of calculating FFB's allowed claim. To the extent that the Court determines that the forbearance rate of 12.00% does not apply, notwithstanding the arguments and authorities raised in Section IV of this supplemental brief, *infra*, the Court should allow FFB's claims at the contractual rates of default of 10.25% for Loan 1295 and 9.75% for Loan 1400.

### III. FFB IS ENTITLED TO ATTORNEYS' FEES AND COSTS IN EXCESS OF THE $25,000.00 PROPOSED BY THE DEBTOR IN ITS REPLY

24. The Debtor and Capital One, take issue with respect to the amount of attorneys' fees that FFB had incurred during the course of the seventeen (17) months this case has persisted. Their arguments, however, miss the mark in several important respects. Their presentation omits several important facts.

25. As this Court well knows, the number of pleadings that are actually filed are not reflective of the work that is done behind the scenes to avoid having to file pleadings.

26. First, the Debtor had been proceeding with a sale of only a minor portion of the entire property that is (finally) being offered for sale. Since the inception of the case, the Debtor repeatedly stated its intent to limit the marketing and sale process of what has colloquially been referred to as the "wings," while leaving the "anchor" property out of consideration. The omission of the crown jewel from this process was openly admitted in the various pleadings filed by the Debtor throughout the case including the three motions to extend the exclusivity period.[8] The Debtor's refusal to market and sell the entirety and maximize returns for creditors (in violation of the Debtor's fiduciary obligations) caused FFB to give serious thought to filing a motion to appoint a chapter 11 trustee, which it researched and analyzed.

27. For whatever reason, Capital One did not support the appointment of a chapter 11 trustee to cleanse the obvious conflict of interest under which DIP management was directing the case. Indeed, it was the obvious conflict that gave FFB no choice but to file motions for routine discovery from both non-debtor affiliates of the Debtor on July 15, 2025 [Docket No. 118], and from various financial institutions where these non-debtor affiliates were believed to hold deposit accounts on July 18, 2025 [Docket No. 124]. FFB did so in an effort to further investigate the propriety of filing a motion to appoint a chapter 11 trustee. As the Court knows, each of these routine motions was opposed by the Debtor and gave rise to a vigorously contested hearing before they were granted.[9] Like most of the costs incurred by FFB during this case, these could have been

---

[8] *Mot. To Extend The Exclusivity Periods For The Debtor to File and Solicit Acceptance of Plan of Reorganization*, at 8-9 [Docket No. 73]; *Mot. for Order Granting Second Extension of Exclusive Periods for the Debtor to File and Solicit Acceptance of Plan of Reorganization*, at 7, 11, & 12 [Docket. No. 88]; *Mot. For Order Granting Third Extension of Exclusive Periods for the Debtor to File and Solicit Acceptance of Plan of Reorganization*, at 7, 9, & 12 [Docket No. 105].

[9] *Objection to Mot. of First Financial Bank for Production of Documents by Various Third Parties Pursuant to Rule 2004* [Docket No. 121]; *Order Scheduling Hr'g on Objection* [Docket No. 123]; *Objection to Mot. of First Financial Bank for Production of Documents Pursuant to Bankruptcy Rule 2004 Directed to Bank of America, N.A. and Pinnacle Bank* [Docket No. 129]; *Order Granting First Financial Bank's Mot. For Production of Documents and Examination Pursuant to Federal Rule of Bankruptcy Procedure 2004* [Docket No. 131].

avoided if DIP management had been observing its fiduciary duties in running this case, as opposed to putting its own personal interests (and those of Capital One) above the interests of the rest of the estate.

28. Likewise, FFB incurred significant costs to commence the preparation of a response to a doomed chapter 11 plan and disclosure statement that were filed on July 28, 2025.[10] These could have been avoided had the Debtor not filed the proposed plan in a desperate and transparent attempt to keep DIP management in control despite the obvious and continued self-dealing of Mark Jankhbash throughout the case. Indeed, it was only after Mark Jankhbash was criminally convicted on August 15, 2025, on 17 out of 18 federal felony charges, including bankruptcy fraud in connection with a case involving an affiliate of this Debtor,[11] that the Debtor started to re-think its position with this exercise in futility. Even then, however, it was not until August 18, 2025 (a mere 16 days prior to the September 3, 2025 disclosure statement objection deadline) that the Debtor waved the white flag and conceded that it would not be moving forward with this ill-conceived proposed plan. Once again, the Debtor is complaining about self-inflicted wounds with respect to continuing costs.

29. Finally, FFB was forced to incur significant fees in order to respond to a procedurally flawed and Constitutionally-defective 506(b) objection raised by way of the Reply and the Capital One Statement of Position, which were each filed less than 48 hours prior to the Initial Sale Hearing. As stated in open court on December 3, 2025, there was (and remains) no compelling need to resolve the issue of FFB's attorneys' fees prior to the approval of the sale.

---

[10] *Plan of Reorganization Dated July 28, 2025 & Disclosure Statement in Support of Plan of Re-organization Dated July 28, 2025* [Docket Nos. 135 & 136]; *Notice and Order Setting Hr'g on Disclosure Statement and Related Deadlines* [Docket No. 137].

[11] *See* Verdict Form, attached hereto as Exhibit 1.

30. In the absence of a settlement or a ruling from this Court approving the proposed FFB Sale Distribution, the appropriate mechanism for resolving the issue of FFB's attorneys' fees was and remains a subsequent motion and hearing after closing. This is particularly the case where FFB continues to incur attorneys' fees which could have been avoided. Essentially, the Debtor (and Capital One) are holding the sale hostage in order to limit FFB's rightful claim. Aside from mounting attorneys' fees resulting from the procedural machinations of the coordinated filings of the Debtor and Capital One, it should be noted that no bar date has been set in this case with regard to the filing of applications of administrative expenses of creditors, including those of estate professionals. As such, the determination of FFB's attorneys' fees can and should be deferred until that time (especially where FFB is offering to reduce the amount to be paid to it from sale proceeds).

31. While the Debtor and Capital One bemoan the size of FFB's attorneys' fees (which currently are less than 2% of the total unpaid principal amount of FFB's claim), the Debtor's professionals have received allowance of fees on an interim basis in the total amount of $85,745.00.[12] The proposed waterfall attached to the Sale Motion identifies total **unpaid** professional fees in the amount of $171,425.00, and the proposed waterfall attached the Reply identifies total **unpaid** professional fees in the amount of $186,425.00.[13] Assuming the identified

---

[12] *Order Granting First Interim Application for Payment of Attorney for Payment of Attorney's Fees and Costs as General Bankruptcy Counsel for Debtor* [Docket No. 82], *Order Granting Second Interim Application for Payment of Attorney for Payment of Attorney's Fees and Costs as General Bankruptcy Counsel for Debtor* [Docket No. 107]; *Order Granting Second Amended First Interim Application for Payment of Attorney's Fees and Costs to Evans, Jones, & Reynolds PC as Local Counsel for Debtor* [Docket No. 149], *Order Granting Third Interim Application for Payment of Attorney for Payment of Attorney's Fees and Costs as General Bankruptcy Counsel for Debtor* [Docket No. 156]. It should be noted that no fee applications have been filed by or on behalf of any of other remaining estate professionals, namely Sherrard Roe Voigt Harbison, PLC, Colliers International or B. Riley Advisory Services.

[13] Ex. E to Sale Motion at 91; Ex. 1 to Reply.

unpaid estate professional fees are in addition to the fees that have already been allowed, FFB's fees are only slightly over a half of what estate professionals are seeking.[14]

IV. **RESPONSE TO MISCELLANEOUS ARGUMENTS RAISED BY THE DEBTOR AND CAPITAL ONE**

A. **FFB DID NOT WAIVE OR OTHERWISE AGREE THAT THE NON-DEFAULT RATES OF INTEREST WOULD CONTROL THE DETERMINATION OF PENDENCY INTEREST**

32. In its Reply, the Debtor states that "FFB never took the position (as it did for the first time in the FFB Response) that its current contract rate of interest was 12%)…." (Reply at 8). That representation is patently false.

33. As argued at the Initial Sale Hearing, Item 9 of FFB's proof of claim filed on November 25, 2024, indicates that FFB was taking the position that the appropriate rate of interest was 12% for each of the FFB loans. (*See* Claim 8-1). The Debtor, itself, pointed out that fact in paragraphs 5-7 of the Sale Motion. (Sale Motion at 10-11).

34. The Debtor also states that that "FFB stipulated that the Debtor was 'current on all post-petition **Interest Payments** to FFB.'" (Reply at 8 (emphasis added)). However, the sentence immediately preceding the phrase cited by the Debtor reads as follows: "On or about August 6, 2024, the Debtor began making monthly non-default/contract payments in the amount of $34,323.46 (the "Interest Payments")." (*Agreed Order Approving Use of Cash Collateral and Granting Related Relief* [Docket No. 78], at 3-4.) In short, the phrase cited by the Debtor does not mean what the Debtor and Capital One would like it to mean. It simply acknowledges that all adequate protection payments that Debtor offered to make in previous months[15] were in fact made.

---

[14] $144,579.10 / ($186,425.00+$85,745.00).

[15] It is worth noting that the Debtor needed to make these payments to avoid stay relief being awarded in favor of FFB. 11 U.S.C. § 362(d)(3)(B)(ii)

16

Case 3:24-bk-02441   Doc 169   Filed 12/09/25   Entered 12/09/25 21:33:19   Desc Main
Document      Page 16 of 19

35. Indeed, if an intentional relinquishment of a known right were intended, there would be no need for the first interim cash collateral order (and all subsequent interim cash collateral orders) to include reservation of rights for the Debtor (and Capital One) with respect to "any post-petition default rate interest, attorneys fees and costs claimed by FFB." (*See id*., ¶ H, at 3.) Likewise, there would be no need for the Debtor to create a separate "Class 7 (Penalty/Default Interest Claims)" in the proposed chapter 11 plan that it filed on July 28, 2025, related to claims for default interest. (*See Plan of Reorganization Dated July 28, 2025*, Section 6.3 at ¶ 18-19 ("Any portion of the FFB Secured Claims that constitute Penalty/Default Interest Claims shall be classified and paid, if Allowed, under Class 7 of the Plan."); Section 6.7 at ¶ 22-23).

36. Notwithstanding the misleading quotations[16] and specious arguments made by the Debtor and Capital One (and the inference that they would have this Court draw from them), there is no good faith argument that FFB waived its rights to assert a claim for post-petition interest calculated at 12.00% per annum.

    **B.**     **THE DEBTOR AND CAPITAL ONE MISINTERPRET THE TERMS OF THE FORBEARANCE AGREEMENTS**

37. The Debtor and Capital One are also singing from the same page with regard to their incorrect interpretation of the Forbearance Agreement. (*See* Reply at 8-9; Capital One Statement at 9-10).

38. This argument finds no support under well-settled cannons of contract interpretation: namely that headings do not control the substance of the language of a contract. *See, e.g., Trustees of Sheet Metal Workers Loc. 7 Zone 1 Pension Fund v. Pro Services, Inc.*, 65 F.4th 841, 848 (6th Cir. 2023); *see also Spurr v. Pope*, 936 F.3d 478, 488 (6th Cir. 2019); *Tonguette*

---

[16] Capital One also omits the reference to the defined term "Interest Payments." (Capital One Statement, at 10-11).

17

Case 3:24-bk-02441 Doc 169 Filed 12/09/25 Entered 12/09/25 21:33:19 Desc Main Document Page 17 of 19

*v. Sun Life Health Ins. Co.*, 595 F. App'x 545, 547 (6th Cir. 2014); *Financial Strategy Group, PLC v. Continental Casualty Co.*, 2014 WL 11515524, at *4 (W.D. Tenn., Sept. 23, 2014)(contract headings cannot be used to alter or replace the detailed text of a contractual provision); *Canada v. Am. Airlines, Inc. Pilot Ret. Ben. Program*, 2010 WL 4877280 (M.D. Tenn. Aug. 10, 2010) *aff'd as modified*, 2014 WL 3320892 (6th Cir. July 9, 2014)(the descriptive heading is not part of a contract and its meaning is not controlling).

39. Once the non-controlling heading of paragraph 2 of the Seventh Amendment to the Forbearance Agreement is removed, the remainder reads as follows: "Under this Seventh Amendment, interest **shall continue** to accrue on the Indebtedness at the rate of twelve percent (12%) per annum, calculated on the basis of a 360 day year for actual days elapsed." (Claim. 8-1, Exs. H & I.) The operative language of the forbearance agreement clearly states that interest continues to accrue at 12.00% without regard to any temporal limitations.

40. It is more than a little ironic that both the Debtor and Capital One assert that FFB waived its rights to claim 12.00% post-petition interest when they have, in fact, waived their right to argue otherwise. As stated in paragraph 13 of the Panagouleas Declaration, filed as Exhibit A to the Limited Objection, the pre-petition interest running from April 5, 2024 (the amended termination date) to July 1, 2024 (the Petition Date) was calculated at the rate of 12.00% per annum. The Debtor and Capital One did not challenge that calculation in connection with any of the interim cash collateral orders entered in this case (and do not challenge the calculation in either the Reply or Statement). Therefore, they have waived their right to challenge it as to post-petition interest and should therefore be estopped from doing so in connection with the calculation of FFB's allowed claim.

## Conclusion

For the foregoing reasons and those raised in the Limited Objection, the Court should overrule the Debtor's objection to FFB's claim, and grant the relief requested herein.

Dated: December 9, 2025

                        Respectfully submitted,

                        /s/    Mark Bogdanowicz    .

                        Mark Bogdanowicz, TN BPR #020655
                        Peter Riggs (Admitted *Pro Hac Vice*)
                        SPENCER FANE LLP
                        1000 Walnut, Suite 1400
                        Kansas City, MO 64106
                        mbogdanowicz@spencerfane.com

                        *Attorneys for Creditor First Financial Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically on December 9, 2025 and served via CM/ECF on all parties receiving electronic notice of such filing.

                        /s/ Mark Bogdanowicz